UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/27/18

EXPERIENCE HENDRIX, L.L.C., a Washington Limited
Liability Company, and, AUTHENTIC HENDRIC,
L.L.C., a Washington Limited Liability Company,

                                          Plaintiffs,

                    -v-

ANDREW PITSICALIS, an individual; LEON
HENDRIX, an individual; PURPLE HAZE
PROPERTIES, L.L.C., a Nevada Limited Liability
Company; ROCKIN ARTWORK, INC., a Nevada
Limited Liability Company; CARMEN COTTONE a/k/a
CARMEN THOMAS ANDOLINA a/ka CARM
COTTONE, an individual d/b/a PARTNERS AND
PLAYERS, a New York Company and d/b/a DYNASTY
GOURMET FOODS, a New York Company; FIREFLY
BRAND MANAGEMENT, L.L.C., a California Limited
Liability Company; FIREFLY CONSUMER
PRODUCTS, INC., a California Corporation; CYNTHIA
MODDERS, an individual; GRASSROOTS
CALIFORNIA d/b/a GRASSROOTS CALIFORNIA, a
Colorado Limited Liability Company; KURT S. ADLER,
a New York Corporation; FREEZE, a division of
CENTRAL MILLS, INC.; and GREEN CURES &
BOTANICAL DISTRIBUTION, INC.,

                                          Defendants.

17 Civ. 1927 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Experience Hendrix L.L.C. and Authentic Hendrix, L.L.C. are the successors-

in-interest to the estate of legendary rock guitarist Jimi Hendrix. They bring this action against

Andrew Pitsicalis, Leon Hendrix, Rockin Artwork, Purple Haze Properties ("PHP"), and

associated individuals and entities. Plaintiffs contend that defendants have manufactured,

licensed, and advertised products that depict Jimi Hendrix and bear his name, and in so doing

have unlawfully used and exploited Jimi Hendrix-related trademarks and copyrights owned by

plaintiffs, in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*; the Copyright Act, 17 U.S.C. §§ 106, 201, 501, and 504; and various state laws. *See* Dkt. 115 ("Third Am. Compl.").

Among defendants, Andrew Pitsicalis is the president of Rockin Artwork and PHP. Leon Hendrix is Andrew Pitsicalis' business partner, the owner of PHP, and a managing member of Rockin Artwork. Collectively, the Court refers to these individuals and entities as the "PHP defendants."

Pretrial discovery has been proceeding under this Court's supervision. As the docket in this matter reflects, the Court has been called upon dismayingly often to act when presented with evidence of the PHP defendants' persistent non-compliance with basic discovery obligations. Plaintiffs now move this Court to sanction these defendants for (1) spoliation of evidence and, more generally, (2) "consistent, pervasive[,] and relentless discovery abuses by [d]efendants and their counsel, Thomas Osinski." Dkt. 245. Plaintiffs request, *inter alia*, a preliminary injunction, an order of attachment, an adverse inference instruction at trial, and terminating sanctions. *See* Dkts. 237, 244. For the reasons below, the Court grants the motion for an adverse inference instruction and directs the PHP defendants to pay the reasonable fees and costs incurred by plaintiffs in bringing this motion.

## I.     Background as to the Instant Discovery Abuses

The Court has been called on repeatedly to issue orders aimed at assuring the PHP defendants' compliance with elementary discovery obligations. *See, e.g.*, Dkt. 74 (scheduling telephonic conference to discuss defense's refusal to produce defendant Carmen Cottone for her scheduled deposition, failure to produce certain financial records and ledgers of the PHP defendants, and misleading representations about whether defendant Andrew Pitsicalis had done business via text messages); Dkt. 78 (directing "defense counsel to conduct a diligent search for,

2

and thereafter produce, all documents responsive to" plaintiffs' document requests and to produce a "sworn declaration attesting, in detail, to the means by which the search was conducted and whether the search uncovered any additional responsive documents, and if so, which documents"); Dkt. 81 ("January 12 Order") (directing defense counsel to submit a supplemental detailed declaration explaining the "concrete steps taken, and the dates those steps were taken, to secure the evidence in question"); Dkt. 231 (directing plaintiffs to file letter chronicling outstanding discovery lapses by the PHP defendants). The Court here recaps the background pertinent to the discovery abuses that plaintiffs have most recently alleged on the part of the PHP defendants and that have prompted plaintiffs to file the instant motion for sanctions. These largely consist of the failure to produce, the delayed production, and the spoliation of evidence stored on electronic devices.

A. **Identification of Non-Produced Devices Containing Relevant Files**

In a January 5, 2018 letter, plaintiffs notified the Court of deficiencies in the PHP defendants' responses to discovery demands and of the PHP defendants' failure to produce and possible spoliation of certain electronically stored evidence. Dkt. 80. Plaintiffs requested, *inter alia*, "leave to make [a] particularized showing and provide clear evidence of multiple other instances of [d]efendants', and their counsel's, misrepresentations, withholding of documents and generally engaging in vexatious and oppressive tactics which have prolonged the discovery process." *Id.* at 3. In an order issued on January 12, 2018, the Court, in response, authorized plaintiffs to "take discovery into the existence of responsive records that have not been produced, and into the means taken to assure the preservation and production of records." January 12 Order. On April 20, 2018, the Court reiterated in an order that plaintiffs are "entitled to access documents related to defendants' document retention and production." Dkt. 104 at 2.

3

After the Court directed the parties to meet and confer, *id.* at 3, the parties agreed upon search terms to apply to electronic devices, but they could not agree on the type or number of such devices to be searched. Dkt. 132. Plaintiffs argued that the January 12 Order covered cellphones and tablets. *Id.* at 2. Plaintiffs further represented that both Andrew Pitsicalis and defense counsel Thomas Osinski, Esq., had made statements indicating that the PHP defendants had multiple computers containing potentially responsive documents. *Id.* The PHP defendants countered that their cell phones and tablets should be held outside the scope of items subject to search, Dkt. 132 at 3, and that Andrew Pitsicalis owned only one laptop and one iPad, Dkt. 144 at 2.

On July 10, 2018, the Court held a hearing to address these disputes. At that hearing, as memorialized in an order issued the following day, the Court directed the PHP defendants to produce forensic images of "every computing device physically located in the office(s) of—or otherwise associated with the business activities of—[the PHP Parties]" by July 16 or, as to certain devices that required a review of potentially privileged material, by July 23. Dkt. 168 ("July 11 Order") at 1. The Court held that "computing devices" encompassed not just laptops, but also cellphones and tablets. *Id.* The Court also required the PHP defendants to "contact every such present or former employee or independent contractor [of theirs] and inquire whether each has retained any records relating to his or her work for the PHP Parties, and if so, obtain such records" and produce them immediately. *Id.* at 2.

**B.    The PHP Defendants' Failure to Produce Forensic Images as Ordered**

On July 17, 2018, the PHP defendants filed a letter requesting additional time to produce forensic images of responsive computing devices. *See* Dkt. 170. The PHP defendants explained that they had had difficulty hiring an expert technician who could image the hard drives and that,

after they had hired a technician, the technician had mistakenly saved "images containing privileged material and those with none on the same drive." *Id.* at 1. Given the time it would take to re-save these images to separate drives, the PHP defendants requested leave to produce all hard drive images, not just ones subject to privilege review, by July 23. *Id.* The Court granted that request. Dkt. 172. But, given the PHP defendants' track record of disregarding discovery obligations, the Court imposed a fine of $100 per weekday after July 23 that the PHP defendants failed to produce the hard-drive images. *Id.*

The PHP defendants, however, did not comply with the order to produce forensic images of these devices.[1] Instead, the PHP defendants produced only the data visibly resident on those devices. *See* Dkt. 174, Ex. B (declaration of Doris Little). On August 2, 2018, the Court ordered the PHP defendants to cure their deficient production by August 9, 2018, warning that if the PHP defendants failed to meet that deadline they must "pay plaintiffs $100 per weekday until all images are provided." Dkt. 178 at 2. In a joint letter filed on August 10, 2018, the PHP defendants "readily admit[ted] the deadline was missed" and stated that they "will not challenge the Courts [sic] imposition of the $100 per day fine." Dkt. 180 at 7. The PHP defendants later represented that it was not until August 17, 2018, that they finally produced these images, *i.e.*, six business days after the extended deadline. *See* Dkt. 185 at 7. Accordingly, the Court ordered the PHP defendants to pay $600 in sanctions to the Registry of the Court. *See* Dkt. 188.

Regrettably, the August 17 production also proved non-compliant with the July 11 Order. Plaintiffs notified the Court that, despite the directive that "[t]he forensic imaging shall include

---

[1] Such images consist of "sector-by-sector cop[ies] of the source [media] replicating the structure and contents of the storage device independent of the file system." *See Expert Witness Disk Image Format (EWF) Family*, Library of Congress, https://www.loc.gov/preservation/digital/formats/fdd/fdd000406.shtml (last updated Feb. 27, 2017).

previously deleted but currently recoverable files," July 11 Order at 1, none of the produced images contained deleted files, Dkt. 190 at 6. Moreover, plaintiffs represented, the PHP defendants had withheld the encryption key for one of the imaged drives until August 29, 2018, despite having been alerted by plaintiffs' counsel to this deficiency on August 20, 2018. *Id.* In response to these lapses and the PHP defendants' concomitant failure to produce documents related to Andrew Pitsicalis' 30(b)(6) deposition, the Court ordered the PHP defendants to pay $4,000 in sanctions to the Registry of the Court by September 13, 2018. *See* Dkt. 194.

The Court separately held that plaintiffs were entitled to compensation for all "billed time fairly traceable to issues arising from defendants' noncompliance with the [Court's] August 22 order." Dkt. 194 at 1. On September 19, 2018, after receiving documentation as to plaintiffs' counsels' billed time, the Court issued an order directing the PHP defendants to "issue to plaintiffs a check in the amount of $12,787.50" by September 21, 2018. Dkt. 213 at 2. By September 24, 2018, the PHP defendants still had not remitted payment to plaintiffs. The Court issued another order directing the PHP defendants to send payment to plaintiffs by September 26, 2018. *See* Dkt. 218. Once again, the Court informed the PHP defendants that they would have to pay $100 in sanctions to the Registry of the Court for each weekday after the deadline that payment remained outstanding. *See id.*

### C.     The PHP Defendants' Use of Anti-Forensic Software

In a September 13, 2018 letter, plaintiffs alerted the Court to a separate problem impairing the PHP defendants' compliance with discovery obligations: The PHP defendants had installed and used anti-forensic software on relevant computers during the pendency of this action. *See* Dkt. 208.

To develop the record as to the PHP defendants' use of anti-forensic software on these computers, the Court scheduled an evidentiary hearing for October 26, 2018, and directed plaintiffs' forensic expert, John T. Myers, to submit a declaration by October 15, 2018.[2] *See* Dkt. 213. The Court also directed Andrew Pitsicalis; Osinski; and Nick Schmitt, a web and graphic designer who worked for PHP as an independent contractor, each to submit, by October 19, 2018, a declaration "setting forth with specificity the timing, circumstances, and purpose of any use of anti-forensic software on devices associated with this litigation since March 16, 2017, whether identified in plaintiffs' expert's declaration or not." *Id.* at 6.

During the October 26, 2018 hearing, the Court heard live testimony regarding the PHP defendants' alleged use of anti-forensic software on, and removal of files from, electronic devices containing documents responsive to the agreed-upon search terms in this lawsuit. The Court heard from five witnesses: (1) Myers, who analyzed the imaged hard drives produced by the PHP defendants; (2) Keenan Milner, the digital forensic image consultant whom the PHP defendants had hired to prepare images of the devices at issue;[3] (3) defense counsel Osinski; (4) Andrew Pitsicalis; and (5) Schmitt.

The Court first heard testimony from Myers regarding his review of the images of the six computing drives that the PHP defendants produced. These six devices were as follows: (1) Computer 1, which belonged to William Pitscalis, Andrew Pitsicalis' cousin and CEO of

---

[2] Myers is a principal of Chorus Consulting and a licensed private investigator in Texas. He has specialized in litigation and dispute services for almost 30 years. Since 2012, he has been a consultant to Trial Solutions of Texas, LLC, d/b/a CloudNine Discovery, a consulting firm that conducts digital forensic and e-discovery investigations. *See* Dkt. 132, Ex. A at 1–2.

[3] Milner worked as a consultant at the accounting firm Crowe Horwath since January 1991 where he conducted digital forensic investigations. Since May 2012, he has been the owner of Milner Digital Forensic Services, Inc. *See* Dkt. 191-1.

defendant Green Cures & Botanicals, Inc.; (2) Computer 2, which belonged to Andrew Pitsicalis; (3) Computer 3, which belonged to PHP's web designer Schmitt; (4) iPhone 1, which belonged to defendant Leon Hendrix; (5) iPhone 2, which belonged to Andrew Pitsicalis; and (6) iPad 1, which also belonged to Andrew Pitsicalis. *See* Dkt. 232 ("Myers Decl.").

Myers, whose testimony the Court deemed credible and persuasive, found that each of the three computers he reviewed contained anti-forensic software. Myers Decl. ¶¶ 19–21. According to Myers, William Pitsicalis' computer contained a program called "Advanced Mac Cleaner," while Andrew Pitsicalis' and Schmitt's computers each contained a program called "CleanMyMac." *Id.* ¶¶ 14–15; Tr. 19, 21.[4] Myers testified that both "CleanMyMac and Advanced Mac Cleaner are tools that have to be downloaded. They have to be affirmatively installed." Tr. at 22. In other words, neither program comes pre-installed on Mac computers, although they can be installed as add-ons to other programs that a user may choose to install. *See id.* at 23.

Both programs scan the computer hard drive and identify files that it has selected for deletion  The programs, however, differ as to the extent to which the deletion process engages the user.

Neither Myers nor Milner offered a rigorous description of how Advanced Mac Cleaner, the program installed on William Pitsicalis' computer, works. Myers admitted that he was not sure whether the ordinary operation of Advanced Mac Cleaner would open a dialogue box to indicate to the user that it had been running and to display the results of its scan. *Id.* at 29. And Milner described Advanced Mac Cleaner as malware; that is, "software that does something

---

[4] Citations to "Tr." refer to the transcript of the October 26, 2018 hearing.

contra to what the user desires or expects or knows anything about." *Id.* at 83.[5] Crucially, Myers

testified—and Milner, the PHP defendants' consultant, concurred in his testimony—that

Advanced Mac Cleaner may be able to eliminate files without specifically alerting the user in

advance or requiring the user's affirmative assent. *See id.* at 28–29, 83.

Myers accordingly focused his testimony on CleanMyMac, the program found on the

computers of Andrew Pitsicalis and Schmitt. As he (and Milner) testified, CleanMyMac allows

users to help free up space on their hard drives by running scans and identifying files that the

user may choose to delete. The user can schedule periodic scans or affirmatively decide to run a

scan. Upon completing a scan, the program opens a dialogue box notifying the user that the scan

has concluded. *See id.* 26. At this point, the user has the option to remove designated files or

not. The user can remove files by simply deleting them or by shredding them. *Id.* at 81. Merely

deleting the file removes it from the hard drive, clearing space for the user to save new data, but

does not make the file immediately unrecoverable. The shred function, in contrast, renders a file

unrecoverable by overwriting it. *See id.* at 81, 107. The user can set parameters as to which files

the program should delete. One way to ensure that certain files get chosen for deletion is by

moving them to the computer's trash bin. *Id.* at 32.

Myers' review of the hard drive images revealed that both Andrew Pitsicalis and Schmitt

had used CleanMyMac to delete files after this lawsuit had been filed. Myers found a utility

installation date of April 10, 2018 on Andrew Pitsicalis' laptop and a utility installation date of

June 20, 2018 on Schmitt's laptop. Myers Decl. ¶¶ 19, 21. A utility installation date does not

necessarily indicate when the program was initially installed, Myers testified, but it does

---

[5] Milner testified that while he had reviewed Schmitt's computer in an attempt to recover deleted
files, he had not reviewed William Pitsicalis' computer. Tr. 103.

indicate, at the least, dates on which an updated version of the program was installed. *See* Tr. 22. Myers testified that his review revealed that Andrew Pitsicalis' computer had run CleanMyMac to delete large and old files as late as May 8, 2018; and that Schmitt's computer had run the program for the same purpose as late as August 27, 2018. Myers Decl. ¶¶ 19, 21.

Andrew Pitsicalis testified that CleanMyMac had already been installed on his computer when he purchased it, used, from a friend. Tr. 150. He testified that he used CleanMyMac to clear "large and old files," and he acknowledged that the program shows the user a little shredder icon giving the user the option to shred, as opposed to delete, those files. *Id.* at 153.[6] He admitted using the program to delete files, including ones that may have been related to Jimi Hendrix. *Id.* at 154. But, he testified, he never affirmatively elected to use the shred function. *Id.*

Schmitt testified that Andrew Pitsicalis recommended CleanMyMac to him as a program that would help him free up space on his hard drive. *See id.* at 125. He could not recall when he had this conversation with Pitsicalis, but he noted that he installed CleanMyMac "quite a while after[ ]" that conversation. *Id.* Schmitt attested that he configured CleanMyMac to delete "cache files and system junk and . . . large and old files," *id.* at 122, but that, due to the sheer quantity of files he had deleted, he could not state under oath that he never deleted any files that related to the Jimi Hendrix business. *Id.* at 127. But, he testified, "little, if any of the work that [he] perform[s], has anything to do with Jimi Hendrix." *Id.* He testified that he never affirmatively used CleanMyMac's shred function when deleting files. *Id.* at 128.

---

[6] According to Myers, the program log lists information for all deleted files, but it does not state whether a given file was deleted or shredded. *See* Tr. 15.

### D. The PHP Defendants' Failure to Ensure Preservation of Documents on a Seventh Computing Device

The evidence at the October 26, 2018 hearing separately established that an iMac desktop computer had been present in Andrew Pitsicalis' office after this lawsuit commenced, and that the contents of this desktop were never reviewed or produced. Plaintiffs discovered evidence of this computer during a review of PHP's Facebook page, which depicted Andrew Pitsicalis, sitting in his office, in immediate proximity to the desktop computer. Dkt. 174, Ex. A.

Defense counsel Osinski testified that he remembered seeing an Apple monitor in Andrew Pitsicalis' office "a few years ago." Tr. 57. But, he testified, he only learned recently that the monitor was connected to a computer and that the computer had been in Pitsicalis' possession until at least as late as April 18, 2017. *Id.* at 62. Osinski testified that at the start of the lawsuit, he had informed Pitsicalis that Pitsicalis had a duty to preserve documents and that he could not allow computers or data to leave his office without saving copies. *Id.* at 42, 62. Osinski testified that his present understanding is that the desktop computer belonged to an individual named Hector David, Jr. who has moved to Florida and who, Osinski assumes, took the computer with him. Osinski, however, did not have personal knowledge of this, or of the contents of the desktop in Andrew Pitsicalis' office. *Id.* at 59. He has neither personally reviewed the files on that computer to determine whether they held responsive records, nor has he contacted David about its contents or about retrieving it. *Id.* at 63. Andrew Pitsicalis, for his part, denied owning the computer and testified that David was not employed by PHP. *Id.* at 163–64. He did not testify as to the circumstances under which this computer came to be in, or was removed from, his office.

### E. Andrew Pitsicalis' Deletion of Relevant Text Messages

The evidence at the October 26, 2018 hearing further reflected that Andrew Pitsicalis had deleted "Jimi"-related text messages from his iPhone. Plaintiffs presented logs reflecting this deletion and enumerating the messages. *See* Dkt. 258-1 ("Deleted Text Message Log").

Myers testified that a forensic examination showed that more than 500 text messages had been deleted from the iPhone during the pendency of this lawsuit. *See* Tr. 174. Of these, Myers found nine that explicitly use the term "Jimi." *Id.* Andrew Pitsicalis had exchanged these text messages between July 12, 2018, the day after the Court's July 11 order directing the PHP defendants to produce responsive documents to plaintiffs, and August 13, 2018, *see* Deleted Text Message Log. Fortuitously, Myers was able to recover the deleted text messages from the imaged phone because those communications had been stored not in the applications used to send and receive them (e.g., iMessage), but in databases where files exist until overwritten or otherwise purged. *See* Tr. 175, 176.

These messages concerned, in part, the marketing and sale of "Jimi"-branded merchandise: the very conduct that plaintiffs have claimed to be actionable in this lawsuit. For example, on July 12, 2018 at 11:23 a.m., Pitsicalis received an email from an individual identified as "Mike." The text message stated that "one of [Mike's] partners is down from Asia" and that "[i]f [they] could swing by tomorrow at 11:00 it would be great regarding Jimi merch overseas." Deleted Text Message Log. When asked by the Court at the hearing if the subject of this message "is within the scope of the activity that's covered by claims in this case," Andrew Pitsicalis acknowledged that it is. Tr. 142. Similarly, among the deleted items, on July 16, 2018, Mike sent Andrew Pitsicalis a text message asking that he send "the clothing designer info on moving forward for Jimi stuff." Deleted Text Message Log.

Among the deleted text messages were ones sent by Andrew Pitsicalis. The evidence at the hearing reflected that he had sent "Mike"—but later sought to delete—messages that emphasized the popularity of Jimi Hendrix, highlighted his company's connections to Jimi Hendrix and "the celebrities and purple haze relating to Jimi," and discussed ways of marketing "Jimi" products to potential buyers. *Id.* When asked by the Court whether it would be "fair to assume that any of the text messages here that use the word 'Jimi' are, in some way, referring to Jimi merchandise," Pitsicalis again said yes. Tr. 144.

## II. Legal Standards

### A. Standards Under Rule 37

Federal Rule of Civil Procedure Rule 37 sets forth procedures for enforcing discovery obligations and sanctioning discovery misconduct. Factors relevant to the decision whether to impose sanctions under Rule 37 include: "(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of his non-compliance." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (citing *Agiwal v. Mid Island Mortg. Corp.,* 555 F.3d 298, 302 (2d Cir. 2009)).

### B. Standards Applicable to the Spoliation of Evidence

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). The Court's authority to sanction litigants for spoliation derives from Rule 37.

A party seeking an adverse inference (or certain other sanctions) from the destruction of evidence must establish: (1) "information that should have been preserved in the anticipation or conduct of litigation [has been] lost because [the opposing party] failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," and (2) "the [opposing] party acted with the intent to deprive [the moving] party of the information's use in the litigation." Fed. R. Civ. P. 37(e). Before the 2015 amendments of Federal Rule 37, the Second Circuit had held that a "culpable state of mind" sufficient to support an adverse inference instruction following spoliation included not merely intentional spoliation, but also negligent spoliation. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002). Following the amendment, however, such an instruction requires a finding that the party accused of destroying, or otherwise failing to preserve, evidence did so intentionally.

## III.  Discussion

### A.  Spoliation of Evidence That Should Have Been Preserved

The first issue is whether the PHP defendants had an obligation to preserve the categories of evidence at issue. A party has an obligation to preserve evidence when it "has notice that the evidence is relevant to litigation . . . [or] should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (internal citations omitted).

That standard is easily met here. All defendants have been on notice of their duty to preserve potentially relevant evidence since at least the time at which plaintiffs initiated this action and served defendants on March 16, 2017. *See* Dkt. 1. Even before formal initiation of an action, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of

14

relevant documents." *Zubulake v. UBS Warburg LLC*, et al., 229 F.R.D. 422, 431 (S.D.N.Y. 2003); *see also Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). The parties to this case have litigated against one another in at least one prior lawsuit, and defendants there were represented by Osinski. Osinski testified that, on March 17, 2017, the day after this lawsuit was filed, plaintiffs' counsel in this case sent him and his clients, the PHP defendants, a litigation hold letter reminding them of their duty to preserve evidence. *See* Tr. 42. He further testified that he specifically discussed the duty to preserve documents, including those stored on computing devices, with his clients. *Id.* at 42–43. And, as this litigation progressed, as a result of the PHP defendants' serial noncompliance, the Court has repeatedly issued orders reminding the PHP defendants of their continued duty to assure the preservation and production of records. *See, e.g.*, Dkts. 78, 81, 104, 134. The PHP defendants, therefore, cannot plausibly claim lack of awareness of their duty to locate and produce relevant files in their possession, custody, or control, including on the electronic devices at issue here (computers, tablets, and phones).

The Court further finds—and the evidence to this effect is overwhelming—that the PHP defendants repeatedly breached this duty. The breaches fall in three categories: (1) the use of cleaning software on covered computing devices, (2) the failure to disclose the existence of a seventh computing device containing potentially relevant documents, and (3) the deletion of relevant text messages.

*Cleaning software*: As to the use of cleaning software on computing devices, the PHP defendants initially resisted that only one device was subject to the discovery orders in this case. Eventually, the PHP defendants begrudgingly disclosed the existence of six such devices. When the Court directed that the contents of these devices be imaged, it emerged from plaintiffs'

examination of the forensic images that "cleaning" software had been installed and used on three of these computers: those belonging to William Pitsicalis, Andrew Pitsicalis, and Schmitt.

The Court finds that the PHP defendants breached their duty to preserve documents by running the cleaning software "CleanMyMac" on Andrew Pitsicalis' and Schmitt's computers. Salient here, that program affirmatively notifies the user when it has completed a scan, and it gives the user the option to delete files permanently. Tr. 81. Regardless of the installation date of this software, Pitsicalis and Schmitt, whom he urged to install the software, necessarily were aware each time the program proposed to delete a file. And the evidence adduced at the October 26 hearing established that each individual permitted such deletions to occur. The evidence demonstrated that software was operational on both computers and was used to delete files during the discovery period in this case. Pitsicalis' computer ran CleanMyMac as recently as May 8, 2018 to delete files, as Myers attested and as Pitsicalis admitted. *See* Myers Decl. ¶ 19; *see also* Dkt. 248 (Andrew Pitsicalis Decl.) at 1 ("The dates and times of use of CleanMyMac set forth in paragraph 19 of John Myers' declaration is accurate[.]"). Schmitt's computer ran CleanMyMac as recently as August 27, 2018 to delete files, as Myers attested and as Schmitt admitted (save for disputing the precise date). *See* Myers Decl. ¶ 21; Tr. 122.[7] There is every reason to assume that these computers contained materials responsive to discovery requests: They belonged to Pitscicalis, the lead individual defendant in this case, who held leadership positions at multiple corporate defendants, and to an individual, Schmitt, responsible for helping to maintain the website for these entities.

---

[7] Schmitt disputed this date at the hearing, but admitted to using the program to delete files not long beforehand. *See* Tr. 122 at 24 (admitting that last time he used the scan function was in "[l]ate July").

The Court reserves judgment, however, on whether the use of Advanced Mac Cleaner on William Pitsicalis' computer qualifies as an act of spoliation. The evidence presented at the hearing as to that computer does not clearly indicate that William Pitsicalis (or any other PHP defendant) used Advanced Mac Cleaner to delete files during this litigation. Myers attested that the utility had been run "at least fifty-five (55) unique times," but, in contrast to the analysis he performed as to the use of CleanMyMac on Andrew Pitsicalis' and Schmitt's computers, he did not identify the dates on which files had been deleted. Myers Decl. ¶ 20. Further, Myers (along with Milner) was uncertain whether Advanced Mac Cleaner could run in the background without the user's knowledge. The evidence at present is, therefore, too equivocal as to whether records on William Pitsicalis' computer were deleted via the installed program during the pendency of this case, and, if so, whether any such deletion would have been known to William Pitsicalis.

*The undisclosed iMac*: The PHP defendants failed to disclose a seventh computing device: the Apple iMac computer that had been in Andrew Pitsicalis' office. *See* Dkt. 174. At the October 26, 2018 hearing, plaintiffs established through photographic evidence that this computer had been in his office during the discovery period. *See* Tr. 163. Osinski, however, admitted that he learned from Andrew Pitsicalis that the current owner of the computer, Hector David, Jr., had taken it to Florida, *id.* at 59, that prior to its removal the computer had never been reviewed for responsive materials, and that the defense had never notified David of the need to preserve its contents and to produce it to enable its contents to be reviewed and/or imaged. *See id.* at 62.

Although the disappearance of the iMac computer makes it impossible to determine its contents conclusively, there is ample circumstantial evidence supporting the inference that it likely contained at least some responsive materials. The iMac computer was in Andrew

Pitsicalis' office and in his possession during much of the pendency of this action. And while defense counsel Osinski improbably testified that he thought the iMac was a mere monitor unattached to any computer, the Facebook picture that revealed the computer in Pitsicalis' office clearly shows the computer to have its own keyboard and to have no evident defect in functionality. *See* Dkt. 174, Ex. A. The computer is situated in a location where Andrew Pitsicalis engaged in the very business conduct at issue in this litigation—the promotion and marketing of new "Jimi" products produced by one of his business's licensees, Humboldt AF. *See id.* While the PHP defendants are at liberty to disprove the relevance of the computer's contents—presumably by retrieving it and demonstrating forensically the absence from it at all relevant times of responsive materials—in the absence of such showing, the Court finds that the computer that was given away without review or imaging likely contained relevant evidence.

*Deletion of text messages*: As developed above, Andrew Pitsicalis deleted text messages relating to "Jimi"-branded marketing efforts this past summer as discovery was ongoing. While some of these were restored from databases on the phone, there is no assurance that all such text messages have been recovered. As Myers explained, when a user deletes a text message from his phone, the text messaging application marks that file as deleted, but the database containing the actual data "may or may not remove the data from its contents." Tr. 176. Thus, while plaintiffs have identified nine deleted text messages that unambiguously reference Jimi Hendrix and Andrew Pitsicalis' business dealings, more may have been deleted and removed from the database. Plaintiffs have adduced overwhelming evidence that Andrew Pitsicalis breached his duty to preserve relevant evidence and that he ignored this Court's myriad orders by affirmatively deleting relevant records from his iPhone.

### B. Much of the Spoliation Was Intentional

Much of the PHP defendants' spoliation of evidence, the Court finds, was intentional. The Court so finds as to: (1) the use of cleaning software on Andrew Pitsicalis' and Schmitt's computers; (2) Andrew Pitsicalis' deletion of relevant text messages; and (3) the disposition of the computer in Andrew Pitsicalis' office.

The use of CleanMyMac on Andrew Pitsicalis' and Schmitt's computers to delete potentially relevant files was intentional, on Pitsicalis' part. Pitsicalis ran anti-forensic software to delete large and old files on his computer as late as May 8, 2018 at 8:09 a.m., and Schmitt ran the same operation as late as June 30, 2018. Myers Decl. ¶¶ 19, 21. To be sure, Schmitt testified that Andrew Pitsicalis did not notify him of the duty to preserve potentially relevant documents on his computer until the middle of 2018, Tr. 117–18, and so it is unclear whether Schmitt was aware that the deletion of files pursuant to this software ran the risk of destroying evidence that was required to be preserved. Andrew Pitsicalis, however, had been well aware of this duty since the initiation of this action. Tr. 147. Yet he still recommended, at some point after March 16, 2017, that his independent contractor Schmitt install this software on a computer used for PHP purposes to delete files to clear up space on his hard drive, and Schmitt acted on this advice. *See* Tr. 117. The Court finds that, by installing anti-cleaning software on his own computer and causing it to be installed on Schmitt's in the face of an unambiguous and known duty to preserve potentially relevant evidence, Pitsicalis intentionally caused the destruction of such evidence.

The defenses proffered by the PHP defendants are unavailing. That Schmitt personally may not have acted with the intent to deleted responsive files is beside the point. The relevant mens rea here is that of Andrew Pitsicalis, who owned PHP, for which Schmitt worked as an independent contractor, and who, despite being a repeat litigant amply on notice of his duty to

preserve potentially relevant evidence, urged Schmitt to run this software to delete files. Tr. 125, 133. Also unhelpful is Pitsicalis' explanation that, at some unspecified point, he went on "Google to search for 'top anti-forensic software' and went through the first 10 pages of search" without finding anything for CleanMyMac. Andrew Pitsicalis Decl. at 2–3. Regardless what Pitsicalis' internet research may have shown, the evidence adduced at the hearing clearly established both that the CleanMyMac software had the capacity to cause the deletion (and shredding) of files, and that Pitsicalis knew this, not least because the software's causation of such deletion was made explicit to the user each time. Pitsicalis does not offer any reason for installing and using this software on his computer, let alone for having done so without first creating an image of the full contents of the computer that would have assured preservation of the computer's contents.

Andrew Pitsicalis' deletion of relevant text messages was also clearly intentional. By his admission, he personally and deliberately deleted, among other text messages, a series of texts concerning the marketing of "Jimi"-related products, the very subject of this lawsuit. He did so one day after the Court issued an order requiring the PHP defendants to "produce to plaintiffs the forensic images of" every device, including phones, containing files that are relevant to this action. Pitsicalis did not offer any coherent defense to this misconduct. The Court finds it to have been a willful and blatant violation of the duty to preserve relevant evidence.

Finally, the Court finds that the removal of a computer from Andrew Pitsicalis' office and its transfer to a Floridian, Hector David, Jr., was an act of intentional spoliation. To be sure, the question is a closer one, if only because the contents of that computer are unknown, and so the Court cannot rule out the possibility that these contents were wholly extraneous to this litigation. The location of the computer in Pitsicalis' office, however, suggests otherwise. Had

the Court been notified of the existence of this computer, it assuredly would have ordered that the computer's contents be searched for responsive materials. It is also noteworthy that Andrew Pitsicalis did not inform his attorney of the existence of this computer. While conceivably these circumstances, in isolation, might have been consistent with the merely reckless disposal of evidence, when this episode is viewed in the light of Pitsicalis' other acts of willful spoliation, the Court has little difficulty finding it, too, to bespeak intentional misconduct.

On the present record, however, the Court cannot so find intentional spoliation as to the use of a different cleaning software, Advanced Mac Cleaner, on William Pitsicalis' computer. In particular, the facts adduced leave open the possibility that the software was installed before this litigation began, and that, once the litigation had begun, the user (William Pitsicalis) would have been unaware that file deletions were ongoing.

### C.    Sanctions Imposed

The trial judge must determine the appropriate sanction for spoliation of evidence on a case-by-case basis. *Fujitsu*, 247 F.3d at 436. Such sanctions should be designed to:

> (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position [they] would have been in absent the wrongful destruction of evidence by the opposing party.

*West*, 167 F.3d at 779. Case-dispositive sanctions, however, "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.*

Considering these objectives, the Court imposes the following two sanctions, regarding (1) Andrew Pitsicalis' computer, iPhone, and desktop computer; and (2) Schmitt's computer, as to each of which the Court has found intentional spoliation. First, the Court will instruct the finder of fact that it may draw an adverse inference from the PHP parties' failure adequately to preserve and produce these materials, to wit, that the devices in question contained evidence of

conduct by the PHP defendants in breach of their legal duties to plaintiffs in connection with the sale and marketing of Jimi Hendrix-related materials.[8]

Second, given the resources plaintiffs again have had to expend in establishing the above-chronicled acts of non-compliance by the PHP defendants with the Court's discovery orders, plaintiffs are entitled to an award reflecting the reasonable attorneys' fees and costs incurred in connection with bringing and litigating the instant successful motion.

To facilitate the determination of the attorneys' fee award, the Court directs plaintiffs' counsel, within one week, to file a declaration detailing the fees and costs uniquely expended on this spoliation motion, through and including in connection with the October 26, 2018 hearing. (For avoidance of doubt, plaintiffs are not to seek recompense for time expended on this motion after October 26, 2018, including the time that will now be spent tabulating fees and expenses towards the award.) Plaintiffs' submission is to be supported by documentary corroboration of the fees and costs for which recompense is sought (e.g., attorney time records and receipts). Defendants will thereafter have one week in which to file any opposition to any particular item(s) for which plaintiffs seek an award.[9]

The Court has carefully considered whether lesser sanctions are adequate to cure the harm caused by the disposition of these materials. The Court's firm conclusion is that no lesser sanction than the combination of an adverse inference instruction and an order directing the

---

[8] The Court defers decision on the precise formulation of the adverse inference instruction until closer to trial.

[9] The Court is aware that plaintiffs have recently alleged yet further discovery violations by the PHP parties. *See* Dkt. 263. Those are outside the scope of this decision. To the extent that the PHP defendants may later be shown to have continued to violate their duty to preserve relevant documents, plaintiffs will have an opportunity to seek recompense for the fees and expenses reasonably incurred in establishing such violations.

prompt recompense of plaintiffs for costs reasonably incurred litigating the meritorious motions

for sanctions based on spoliation would adequately remedy plaintiffs' injury. *See, e.g., Moody v.*

*CSX Transp., Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017) (finding adverse inference

appropriate where defendants intentionally lost material evidence); *Ottoson v. SMBC Leasing*

*and Finance, Inc.*, 268 F. Supp. 3d 570, 584 (S.D.N.Y. 2017) (granting an adverse inference

instruction where plaintiff "has acted willfully or in bad faith" in violation of her duty to preserve

certain emails); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-1893-HRL, 2016

WL 5870218 (N.D. Cal. Oct. 7, 2016) (imposing adverse inference instruction for intentional

deletion of text messages and awarding plaintiffs attorneys fees incurred in bringing sanctions

motions). The Court has also carefully considered whether this is the rare case in which

terminating sanctions are merited, as plaintiffs have urged. *See* Dkt. 237. At the present time,

the Court's judgment is that such extreme sanctions are not warranted, although further acts of

spoliation and/or other discovery abuses could produce a different result.

    The Court also declines at this point to issue the preliminary injunction that plaintiffs

have separately pursued. *See* Dkt. 237. Such relief requires an assessment not of defendants'

discovery abuses, but of, *inter alia*, plaintiffs' claims. The Court is not yet in a position reliably

to make such an assessment. This ruling is without prejudice to plaintiffs' rights to seek such

relief upon a more developed record.

## CONCLUSION

    For the reasons stated above, the Court grants plaintiffs' motions for discovery sanctions,

but denies without prejudice plaintiffs' motions for terminating sanctions and for a preliminary

injunction. The Court respectfully directs the Clerk of Court to terminate the motions pending at

Dkts. 237 and 244.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: November 27, 2018
       New York, New York