UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

EXPERIENCE HENDRIX, L.L.C., et al.,       :

               Plaintiffs,       :       <u>REPORT AND RECOMMENDATION</u>

     -v.-               :        

                                             17 Civ. 1927 (PAE) (GWG)

ANDREW PITSICALIS, et al.,         :

              Defendants.      :

------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

This copyright and trademark case was brought by the owners of copyrights and trademarks related to the famed performer and songwriter Jimi Hendrix against various corporate and individual defendants, including Jimi Hendrix's brother Leon Hendrix. The plaintiffs are Experience Hendrix, LLC ("Experience"), and Authentic Hendrix, LLC ("Authentic"). They now seek a default judgment against (1) Leon Hendrix ("Hendrix") and (2) two other defendants: Green Cures & Botanical Distribution, Inc. ("GRCU"), and Carmen Cottone.[1] We refer to the non-Hendrix defendants (Cottone and GRCU) and Hendrix together as the "defaulting defendants."

---

[1] <u>See</u> Findings of Fact and Conclusions of Law, filed Oct. 21, 2019 (Docket # 363) ("Pitsicalis Findings"); Proposed Findings of Fact and Conclusions of Law — Leon Hendrix, filed Feb. 3, 2020 (Docket # 441) ("Hendrix Proposed Findings"); Proposed Findings of Fact and Conclusions of Law — Defendants Carmen Cottone and Green Cures & Botanical Distribution, Inc., filed Feb. 3, 2020 (Docket # 442) ("Non-Hendrix Proposed Findings"); Declaration of Dorothy M. Weber, filed Feb. 3, 2020 (Docket # 443) ("Weber Decl."); Declaration of Judith A. Meyers, filed Feb. 3, 2020 (Docket # 444) ("Meyer Decl."); Declaration of Janie Hendrix in Support of Findings of Fact and Conclusions of Law as to Defendant Leon Hendrix, filed Feb. 3, 2020 (Docket # 446) ("Hendrix Decl."); Declaration of Janie Hendrix in Support of Findings of Fact and Conclusions of Law as to Defendants Cottone and GRCU, filed Feb. 3, 2020 (Docket # 447) ("Hendrix II Decl.").

For the reasons that follow, plaintiffs' motions for a default judgment should be granted as described below.

I. <u>BACKGROUND</u>

On March 16, 2017, plaintiffs filed a complaint against, <u>inter alia</u>, Hendrix and Cottone. <u>See</u> Complaint, filed Mar. 16, 2017 (Docket # 1). An amended complaint was later filed, <u>see</u> Amended Complaint, filed April 26, 2017 (Docket # 38), which Hendrix and Cottone answered. The operative complaint is now the third amended complaint, <u>see</u> Third Amended Complaint, filed April 25, 2019 (Docket # 115) ("TAC"), which is the first complaint to include GRCU as a defendant, and which all the now-defaulting defendants answered, <u>see</u> Answer of Defendants to Plaintiffs' Third Amended Complaint, filed May 23, 2018 (Docket # 142). The TAC brings a litany of claims including trademark infringement, 15 U.S.C. § 1114; false designation of origin, 15 U.S.C. § 1125(a); trademark dilution by blurring and tarnishment, 15 U.S.C. § 1125(c); federal cyber piracy, 15 U.S.C. § 1125(d); infringement of common law trademark rights; copyright infringement, 17 U.S.C. § 501; contributory infringement; vicarious infringement; deceptive acts, N.Y. Gen. Bus. Law § 349; false advertising, New York Gen. Bus. Law § 350; dilution, N.Y. Gen. Bus. Law § 360-1; alter ego liability (brought only against Hendrix); unjust enrichment; and constructive trust. TAC ¶¶ 108-240.

Eventually, GRCU and Cottone's counsel moved to withdraw from representation. (Docket # 280). The motion was granted. (Docket ## 282, 299). No new counsel appeared for GRCU and thus GRCU was ultimately deemed to be in default. (Docket # 386). Cottone failed to appear at a conference as directed by the Court and made no further appearance in the action. <u>See</u> Declaration of Dorothy M. Weber in Support of Plaintiffs' Request for Clerk's Certificates of Default, filed Nov. 19, 2019 (Docket # 384) ¶¶ 12, 14-15. On November 22, 2019, plaintiffs

filed a motion for default judgment against, <u>inter alia</u>, Cottone and GRCU.  (Docket # 390).  On December 17, 2019, the Court issued an order granting plaintiffs' motion for a default judgment against Cottone and GRCU.  (Docket # 415).

On December 9, 2019, the Court issued an order granting plaintiffs' request for terminating sanctions against Hendrix because of his misconduct, including discovery abuses. (Docket # 398) ("Hendrix Terminating Sanctions Order").  A default judgment was issued against Hendrix on December 10, 2019.  (Docket # 402).

The case was then referred to the undersigned for an inquest.  (Docket ## 418, 423).  On February 3, 2020, plaintiffs filed proposed findings of fact and conclusions of law as to each of the defaulting defendants.  <u>See</u> Hendrix Proposed Findings; Non-Hendrix Proposed Findings. Those proposed findings were served on each of the defaulting defendants.  (Docket ## 448, 449).  None of the defaulting defendants filed any submission in response.

II.  <u>LIABILITY OF DEFAULTING DEFENDANTS</u>

In light of defendants' default, plaintiffs' properly pleaded allegations in the complaint, except those related to damages, are accepted as true.  <u>See</u>, <u>e.g.</u>, <u>City of N.Y. v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (quoting <u>Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 246 (2d Cir. 2004)); <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor.").

In their proposed findings, plaintiffs seek damages for copyright infringement against Hendrix, trademark infringement against Hendrix and GRCU, and damages under the

Anticybersquatting Consumer Protection Act ("ACPA") against Cottone. Hendrix Proposed Findings ¶ 76; Non-Hendrix Proposed Findings ¶ 86. Accordingly, we confine our analysis to those claims.

A. Elements of Liability

To establish liability for trademark infringement, plaintiffs must allege (1) they have "a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark [or colorable imitation], (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods or services,' 15 U.S.C. § 1114(1)(a), (5), without the plaintiff's consent." 1–800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406–07 (2d Cir. 2005) (internal citations omitted). Plaintiffs are also required to establish (6) that use of the mark "'is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiffs], or as to the origin, sponsorship, or approval of [the defendants'] goods, services, or commercial activities by [plaintiffs].'" Id. at 407 (quoting 15 U.S.C. § 1125(a)(1)(A)).

To establish liability for copyright infringement, a party must show both "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co. Inc., 499 U.S. 340, 361 (1991); accord Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir. 2005).

Section 1125(d)(1)(A), also known as the Anticybersquatting Consumer Protection Act ("ACPA"), provides in relevant part:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person — (i) has a bad faith intent to profit from that mark, . . . ; and (ii) registers, traffics in, or uses a domain name that — (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).

B. <u>Liability Allegations Applicable to All the Defaulting Defendants</u>

Experience is a limited liability corporation established under the laws of the State of Washington.  TAC ¶ 15.  Authentic is the licensing arm of Experience.  <u>Id.</u> ¶ 16.  Experience owns the musical compositions and sound recordings of Jimi Hendrix.  <u>Id.</u>  Experience is the assignee of, and exclusive owner of, the copyright and trademark rights previously owned by Jimi Hendrix (the "Hendrix marks").  <u>Id.</u> ¶ 15.  These include various Hendrix trademarks that are registered on the Principal Register of the United States Patent and Trademark Office ("USPTO").  <u>Id.</u> ¶¶ 41-42; <u>see also</u> Trademark Schedule, filed April 25, 2018 (Docket # 115-1).  Some of the Hendrix marks have become uncontestable under the trademark laws.  TAC ¶ 42.  The Hendrix marks registered by plaintiffs include "Jimi Hendrix," "The Jimi Hendrix Experience," "Hendrix," "Experience Hendrix," and "Authentic Hendrix."  <u>Id.</u> ¶ 41.

Plaintiffs have developed a licensing program for their Jimi Hendrix-related intellectual property.  <u>Id.</u> ¶ 39.  Since at least 1996, plaintiffs have used federally-registered and common-law trademarks to sell Jimi Hendrix promotional merchandise and services through catalog sales, websites, retail stores, and licensee sales.  <u>Id.</u> ¶ 40.  Plaintiffs and their licensees have made continuous and substantial use of the Hendrix marks, and consequently plaintiffs have become the recognized official source of Jimi Hendrix related goods and services.  <u>Id.</u> ¶¶ 43, 46.  Thus, plaintiffs have a valid mark protected by the Lanham Act, the first element required to state a claim for trademark infringement against the defaulting defendants.  <u>See</u> <u>1–800 Contacts, Inc.</u>, 414 F.3d at 406-07.

Experience's copyright registrations related to Jimi Hendrix include No. Ep 11766 for the original musical composition "Purple Haze," TAC ¶ 50, and No. VA 609-735 for the album

artwork of the rereleased "Jimi Hendrix Experience album Axis: Bold as Love," id. ¶¶ 54, 56. Plaintiffs have complied with the Copyright Act of 1964 and all other copyright laws. Id. ¶ 52. These allegations satisfy the first element required to establish copyright infringement liability against the defaulting defendants: Experience's ownership of valid copyright material. See Feist Publ'ns, Inc., 499 U.S. at 361.

C. Liability of Hendrix

The factual allegations of the TAC establish that Hendrix is liable for trademark and copyright infringement.[2]

As alleged in the TAC, Hendrix was a business partner of Andrew Pitsicalis. TAC ¶ 18.[3] Together with Pitsicalis, and corporations controlled by Pitsicalis including defendant Rockin Artwork, LLC ("RA") and defendant Purple Haze Properties, LLC ("PHP"), Hendrix infringed on plaintiffs' intellectual property by using the Hendrix marks in "the creation, development, licensing, manufacturing, promotion, advertising and sale of Cannabis, edibles, food, wine, alcohol, 'medicines,' electronic products, and other goods." Id. ¶ 5; see also id. ¶¶ 117-135 (15 U.S.C. § 1125(a) claim). These allegations satisfy the second, third, and fourth elements of a trademark claim: (2) use of the infringed upon mark, (3) in commerce, (4) in connection with the sale of goods or services. See 1–800 Contacts, Inc., 414 F.3d at 406-07. Hendrix's use of the

---

[2] Plaintiffs' proposed findings include a number of proposed findings related to Hendrix's liability for causes of action contained in the complaint for which they have not requested damages. See, e.g., Hendrix Proposed Findings ¶¶ 52-54 (alleging Hendrix violated a number of state laws). Given that plaintiffs do not seek damages for these claims, they are irrelevant to this inquest and we do not consider them.

[3] The TAC makes allegations against several defendants together, including Hendrix, whom plaintiffs call the "Pitsicalis defendants." TAC ¶ 5. Accordingly, we construe allegations made against the "Pitsicalis defendants" in the TAC to be allegations made against Hendrix individually.

Hendrix marks was not authorized by plaintiffs, see TAC ¶¶ 14, 37-38, 79, 84, 111, 120, satisfying the fifth element of a trademark claim: unauthorized use of a trademark, see 1–800 Contacts, Inc., 414 F.3d at 406-07. Lastly, Hendrix's use of "Jimi," "Jimi Hendrix," and variations of those marks falsely suggested a connection with plaintiffs' Hendrix marks, thus satisfying the sixth and final element of a trademark claim: likelihood of confusion. TAC ¶¶ 38, 83, 123.

As for copyright infringement liability, the TAC alleges that Hendrix made unauthorized use of plaintiffs' federally registered copyrights. TAC ¶¶ 65, 72; see also id. ¶¶ 164-176 (copyright infringement claim). This allegation is sufficient to satisfy the second and remaining element required to establish liability against Hendrix for copyright infringement: the "copying of constituent elements of the work that are original." Feist Publ'ns, Inc., 499 U.S. at 361.

D. Liability of Cottone and GRCU (the Non-Hendrix Defendants)

As described below, the allegations of the TAC establish that Cottone is liable under the ACPA and GRCU is liable for trademark infringement.

1. Cottone's Liability

As previously noted, the ACPA requires a plaintiff to demonstrate that "(1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." Webadviso v. Bank of Am. Corp., 448 F. App'x 95, 97 (2d Cir. 2011) (citing 15 U.S.C. § 1125(d)(1)(A)); accord Curated Works Inc. v. Deal.com, Inc., 2020 WL 2375079, at *2 (S.D.N.Y. May 12, 2020). In assessing bad faith intent to profit, "a court may consider factors such as, but not limited to"

(I) the trademark or other intellectual property rights of the person, if any, in the

domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).  A "classic ACPA claim arises where a defendant registers 'a domain name of an established entity in bad faith, and then offer[s] to sell the domain name to the entity at an exorbitant price.'"  Curated Works Inc., 2020 WL 2375079, at *5 (quoting Target Advert., Inc. v. Miller, 2002 WL 999280, at *10 (S.D.N.Y. May 15, 2002)).  However, a complaint also states an ACPA claim where it alleges "a defendant 'intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's.'"  Gioconda Law Grp. PLLC v. Kenzie, 941 F. Supp. 2d 424, 434 (S.D.N.Y.

2013); see also Webadviso, 448 F. App'x at 98 (defendant "ran afoul of the ACPA" because regardless of "whether or not he had any intention of selling the domain names to [plaintiff], he clearly had the intention to profit from the goodwill associated with the trademarks that comprised the domain names.  His business model relied upon diverting internet users (presumably, among others, those who were attempting to access the websites of [plaintiff]) to his own website."); Target Advert., 2002 WL 999280, at *10 ("[I]t would be logically inconsistent for the [ACPA] to prohibit the unlawful registration or use of a domain name in order to profit through its sale, but permit the unlawful registration and use of a domain name in order to profit through its use.").

As alleged in the TAC, defendant Cottone is an individual that did business in New York, California, and Florida.  TAC ¶ 21.  Cottone registered domain names that incorporate plaintiffs' federal registered and incontestable trademarks including jimifoods.com, jimiwines.com, and jimiteas.com.  Id. ¶¶ 150-51.  Plaintiffs' marks were distinctive at the time the infringing websites were registered.  Id. ¶ 153; Pitsicalis Findings ¶¶ 11, 13.  These allegations satisfy the first and second elements of an ACPA claim: infringing use of a domain name that is identical or confusingly similar to a distinctive registered mark.  Webadviso, 448 F. App'x at 97.  With respect to bad faith intent to profit, plaintiffs allege that Cottone entered into a license with PHP/RA to sell infringing Jimi Hendrix products including "Jimi Wines" and "Jimi Salsa" through his websites.  TAC ¶¶ 38, 75.  Cottone has accepted orders for these infringing products.  Id. ¶ 38.  The statutory factors make clear that these allegations, along with other allegations contained in the TAC, are sufficient to establish "bad faith intent to profit."  15 U.S.C. § 1125(d)(1)(A)(i); id. § 1125(d)(1)(B)(i).  To address a few, Cottone has no intellectual property rights in the domain names.  TAC ¶¶ 151, 152, 155; see 15 U.S.C. § 1125(d)(1)(B)(i)(I).  The

domain names do not include Cottone's name. See 15 U.S.C. § 1125(d)(1)(B)(i)(II). There is no indication Cottone previously used the domain names to make bona fide sales, or that there is non-commercial or fair use of the Hendrix marks occurring on the domain names. See id. § 1125(d)(1)(B)(i)(III); id. § 1125(d)(1)(B)(i)(IV). Lastly, Cottone has registered multiple infringing domain names. TAC ¶ 152; see 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). Accordingly, plaintiffs have adequately pled Cottone's bad faith intent to profit, and thus have established Cottone's liability under the ACPA.

### 2. GRCU's Liability

GRCU is a Colorado corporation. TAC ¶ 30. GRCU developed, marketed, and sold a line of "cannabis-infused skin care products and beverages" that infringed "upon the Hendrix Marks." Id. ¶ 65. This allegation establishes that GRCU used the Hendrix marks in commerce for the sale of goods. None of these sales were authorized by plaintiffs. Id. ¶¶ 111, 120. Additionally, the use of the marks was likely to cause confusion. Id. ¶¶ 111, 112, 120. Thus, all of the requisite elements of a trademark infringement claim are alleged in the TAC, and plaintiffs have established GRCU's liability as to that claim. See 1–800 Contacts, Inc., 414 F.3d at 406-07.

### III. DAMAGES

Plaintiffs bear the burden of establishing their entitlement to the amount of damages they seek. See Trs. of Local 813 Ins. Tr. Fund v. Rogan Bros. Sanitation Inc., 2018 WL 1587058, at *5 (S.D.N.Y. Mar. 28, 2018). While a court must "take the necessary steps to establish damages with reasonable certainty," Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997), a court need not hold a hearing "as long as it ensure[s] that there [is] a basis for the damages specified in [the] default judgment," Fustok v.

ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989). In this case, the Court finds that a hearing is unnecessary inasmuch as plaintiffs' submissions have not been contested.

We first address plaintiffs' request for Lanham Act damages based on Hendrix and GRCU's profit and then turn to their request for statutory damages against Hendrix and Cottone under the Copyright Act and the ACPA.

A. Lanham Act Damages Based on Hendrix and GRCU's Profit

To recover damages for the infringer's profits under the Lanham Act, a plaintiff must show "a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of [Title 15 of the United States Code], or a willful violation under section 1125(c)." 15 U.S.C. § 1117(a). Additionally, profits are "normally available only if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the accounting is necessary to deter a willful infringer from doing so again." George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992) (internal quotation marks and citation omitted); accord U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta, Inc., 2009 WL 4351962, at *2 (S.D.N.Y. Dec. 1, 2009), adopted by 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009); Chloe v. Zarafshan, 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009).

The Second Circuit has held that while these showings are necessary to obtain profits, they are not sufficient. See George Basch Co., 968 F.2d at 1540. Thus, while "the egregiousness" of fraudulent conduct may suffice to obtain profits, a court must normally also consider the following factors:

> (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5)

plaintiff's unclean hands.

Id.[4]  Where a plaintiff shows an entitlement to profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a); accord Am. Honda Motor Co., Inc. v. Two Wheel Corp., 918 F.2d 1060, 1063 (2d Cir. 1990).  Nonetheless, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  15 U.S.C. § 1117(a).

Plaintiffs seek $240,000 in trademark damages against Hendrix, based on his "minimum profits" from infringement.  Hendrix Findings ¶¶ 93-95.  Plaintiffs also seek $350,000 in trademark damages against GRCU, based on its "profits."  Non-Hendrix Findings ¶¶ 94-96.

Here, plaintiffs have made the threshold showing of entitlement to Hendrix and GRCU's profits under 15 U.S.C. § 1117(a) inasmuch as Hendrix and GRCU admitted to the allegation that they violated 15 U.S.C. 1125(a), TAC ¶¶ 117-135, by virtue of their default.  The allegations in the complaint are also sufficient to satisfy George Basch Co.'s requirements for an award of profits.  See 968 F.2d at 1540.  The complaint alleges that Hendrix and GRCU benefitted from their improper use of plaintiffs' trademarks and that Hendrix and GRCU are directly responsible for the infringement.  TAC ¶¶ 120, 121, 123.  Plaintiffs have not delayed in enforcing their rights nor is there any evidence that plaintiffs have unclean hands.  Further, we conclude that an award

_____

[4]  The Supreme Court recently held that a showing of willfulness is not a prerequisite for a recovery under section 1125(a) — thus abrogating George Basch Co.'s holding on this point.  See Romag Fasteners, Inc v. Fossil, Inc., 140 S. Ct. 1492 (2020).  Nonetheless, the Supreme Court held that a court may still use "principles of equity" in deciding whether to award profits.  See id. at 1496.  Because the factors we quote from George Basch Co. are directed to equitable principles, they continue to be applicable.

of profits is necessary to deter others from trademark infringement in the future. Accordingly, plaintiffs have shown an entitlement to an award of profits under 15 U.S.C. § 1117(a).

We discuss next whether plaintiffs have proven the amount of profits.

### 1. Hendrix's Profits

To be entitled to an award of profits, 15 U.S.C. § 1117(a) dictates that a plaintiff is "required to prove defendant's sales." Once a plaintiff proves the amount of those sales, the burden switches to the defendant to prove "all elements of cost or deduction claimed." Here, of course, Hendrix has not proffered any evidence as to costs or other deductions. Thus, the only question we must determine is whether plaintiffs have met their burden of proving the amount of sales Hendrix made of products that infringed on plaintiffs' trademarks.

Plaintiffs do not offer any direct evidence of sales made by Hendrix. Instead, plaintiffs have submitted deposition testimony from Hendrix that indicates he was paid $3,500 per month by Pitsicalis from approximately 2014 or 2015 until January 2019. See Deposition of Leon Morris Hendrix, dated November 2, 2017 (Docket # 443-1) ("2017 Hendrix Dep.") at 94-95; Deposition (Remotely via Skype) of Leon M. Hendrix, dated Oct. 25, 2019 (Docket # 443-2) ("2019 Hendrix Dep.") at 20. Plaintiffs do not explain their calculations, but the Court assumes they have multiplied Hendrix's monthly salary by twelve to arrive at his annual salary, and multiplied that number by five to calculate that Hendrix was paid $210,000 for the five years he worked with Pitsicalis. Plaintiffs also provide additional deposition testimony that indicates Hendrix received "something like" $30,000 from Tiger Paw Distributers LLC as the result of a licensing agreement for the distribution of Hendrix branded alcoholic beverages. See 2017 Hendrix Dep. at 91; TAC ¶ 10 (Tiger Paw Beverages created "a line of alcoholic beverages using the Hendrix Marks and other copyrights"). It appears that plaintiffs have combined the $210,000

13

and $30,000 figures to arrive at a profit calculation.

As case law makes clear, "some reasonable basis for computation [of infringer's sales] has to be used, even though the calculation may only be approximate." Chloe, 2009 WL 2956827 at *5 (citing GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002)).  While it is a close question, we believe that plaintiffs' submissions are sufficient to allow us to find that Hendrix's salary must represent an amount earned by him as a result of the gross sales of goods infringing on plaintiffs' trademarks.

The record reflects that Pitsicalis, PHP, RA, other corporate entities, and Hendrix all acted together to improperly use plaintiffs' trademarks and copyrights "for their own personal gain, in willful and purposeful violation of various Federal Court injunctions and prohibitions which have repeatedly prohibited and enjoined those unlawful activities."  Pitsicalis Findings ¶ 18.  Hendrix, Pitsicalis, and these entities all "work[ed] together" to "create[] the illusion of an empire of 'authentic' Jimi Hendrix goods which include Cannabis, edibles, food, wine, alcohol, 'medicines,' and electronic products."  Id. ¶ 20.  Pitsicalis and his entities all infringed the plaintiffs' trademarks and copyrights.  Id. ¶¶ 26-27.  In light of the fact that Hendrix was the partner of Pitsicalis, the founder and an owner of Defendant PHP, TAC ¶ 18, it is a reasonable inference that the sole source of revenue for Pitsicalis and these companies was the income gained from the infringement of plaintiffs' trademarks and copyrights, and that any salary paid to Hendrix had to come from the sales generated by the infringing products.  It is also reasonable to assume that the payment from Tiger Paw Beverages to Hendrix reflected the revenue from gross sales of infringing products given that Pitsicalis, among others, formed "a business relationship with Tiger Paw Beverages for the purpose of creating a line of alcoholic beverages using the Hendrix Marks and other copyrights."  TAC ¶ 10.  Thus, we conclude that Hendrix's activities

generated at least $240,000 in sales of infringing products.

### 2. GRCU's Profits

As to GRCU's profits, plaintiffs have introduced a license agreement between GRCU, as licensee, and PHP, one of the Pitsicalis entities, as licensor, to create a "'Hemp Tea Based Beverage' featuring Jimi Hendrix indicia." Non-Hendrix Proposed Findings ¶ 79; see also GRCU PHP License, filed Feb. 3, 2020 (Docket # 443-14) ("GRCU License"). PHP is one of the entities Pitsicalis used to illegally infringe on and exploit the plaintiffs' trademarks. Pitsicalis Findings ¶¶ 18-19, 26-27.

The licensing agreement purports to license GRCU to sell "Hemp Tea Based Beverage[s] featuring [the] Likeness of Jimi Hendrix and featuring/named for Jimi Hendrix song titles." GRCU License at 10. However, PHP had no authority to grant such a license and thus any sale of the products by GRCU would have constituted infringement. See Hendrix II Decl. ¶ 16 ("Defaulting Defendants never sought permission to use the Hendrix Marks. I never approved or authorized Defaulting Defendants' use of the Hendrix Marks on their products or services."); TAC ¶ 65 (alleging GRCU marketed "a line of cannabis-infused . . . beverages, which infringe upon the Hendrix Marks"). The licensing agreement had an effective date of February 29, 2016. GRCU License at 2.

Under the license, GRCU was required to pay PHP 15% of sales as a royalty fee, with an annual minimum royalty of $100,000, and a $50,000 royalty advance due at the time of signing. Id. at 10. A payment of $150,000 was due at signing, with the next payment due fifteen months from signing, and all other payments due twelve months thereafter. Id. Plaintiffs note that GRCU "stood to make" at least $350,000. Non-Hendrix Proposed Findings ¶ 94. Plaintiffs calculate the $350,000 figure presumably based on the $50,000 advance, plus three years of the

15

$100,000 annual royalty fee.  Id. ¶ 96.  They argue that "[d]ue to GRCU's failure to produce discovery and the spoliation by their licensor, Pitsicalis and PHP, the only possible inference is that GRCU earned the minimum value of the license for the three years it was in effect."  Id. ¶ 94.

We begin by noting that there is no evidence that GRCU engaged in spoliation and thus no adverse inference based on spoliation of documents may be made against GRCU.  We also recognize that if the actual sales of an infringer "cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's . . . failure to produce documentary evidence."  Chloe, 2009 WL 2956827 at *5 (citation omitted); accord GAKM Res. LLC v. Jaylyn Sales Inc., 2009 WL 2150891, at *6 (accepting that "[a]ny imprecision in calculating Defendants' profits is the fault of Defendants, who failed to participate in this litigation").

Nonetheless, we cannot calculate sales based on pure surmise and supposition.  Rather, there must be a "reasonable basis for [the] computation."  Chloe, 2009 WL 2956827, at *5; accord Travel Leaders Grp., LLC v. Corley, 2019 WL 6647319, at *11 (S.D.N.Y. Dec. 5, 2019). This derives from the principle that "[a] plaintiff seeking damages following a default bears the burden to introduce sufficient evidence to establish the amount of damages with reasonable certainty."  Melwani v. Nature Republic Int'l LLC, 2019 WL 1582087, at *4 (S.D.N.Y. Mar. 27, 2019) (internal quotation marks and citation omitted), adopted by 2019 WL 1585097 (S.D.N.Y. Apr. 12, 2019); accord Designer Greetings, Inc. v. Shah, 2015 WL 13745443, at *4 (E.D.N.Y. Nov. 25, 2015) (rejecting damages request at an inquest where, based on the evidence submitted, the court was "unable to make a determination of damages with reasonable certainty"), adopted by 2016 WL 1029496 (E.D.N.Y. Mar. 15, 2016).

The problem here begins with the fact that plaintiffs have presented no evidence in their motion papers of even a single specific sale of infringing product by GRCU. Because a licensee does not normally pay money to a licensor for no reason, we accept that the license agreement constitutes evidence that GRCU <u>expected</u> to make sales. But not only is there no evidence at all that GRCU made any sales, there is no evidence that GRCU ever actually paid any money to PHP. All we have before us is proof that GRCU signed a document obligating it to pay money to PHP to sell the infringing product. This is simply not enough to make the inferential leap that GRCU actually made any sales, let alone that it made sales in the amount of the expected payments.

Obviously, plaintiffs should not be punished based on GRCU's failure to participate in discovery, and any doubts must be resolved in plaintiffs' favor given the unavailability of "documentary evidence." <u>Chloe</u>, 2009 WL 2956827 at *5 (citation omitted). Nonetheless, "such difficulties cannot serve to relieve the necessity for reasonable certainty in discharging the burden of proof resting upon the complainant." <u>Merch. Media, LLC v. H.S.M. Int'l</u>, 2006 WL 3479022, at *12 (S.D.N.Y. Nov. 30, 2006) (citation and internal quotation marks omitted); <u>accord</u> <u>7-Eleven, Inc. v. Z-Eleven Convenience Store Inc.</u>, 2018 WL 1521859, at *4 (E.D.N.Y. Jan. 17, 2018) ("That the application for profits is made in the default judgment context . . . does not obviate the need for the Court to have some basis to make such an award."), <u>adopted by</u> 2018 WL 1466799 (E.D.N.Y. Mar. 26, 2018). In the absence of any other evidence regarding infringing sales, the Court is unable to conclude that plaintiffs' have provided a "reasonable basis for computation," <u>Chloe</u>, 2009 WL 2956827 at *5, of GRCU's profits from infringement. <u>See</u> <u>Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.</u>, 855 F.3d 163, 177 (3d Cir. 2017) ("[W]here a district court endeavors to calculate damages under the Lanham Act on the basis of

the defendant's actual profits . . . it must ground its estimate in the record — e.g., business records, credible witness testimony, expert testimony, or industry data — in order to pass muster as a reasonable estimate and an appropriate exercise of discretion."). Accordingly, even under the relaxed standards that apply to calculations of profits in the context of default judgment, plaintiffs have not established GRCU's profits from infringement, and should not be awarded trademark damages against GRCU.

We conclude by noting that the circumstances here are similar to those faced by Judge Bulsara of the Eastern District of New York in a trademark case in which a defendant similarly defaulted without providing necessary discovery:

> It may appear unjust that [plaintiff] cannot recover any measure of profits for [defendant's] clear infringement of its trademarks. [The defendant] did not participate in the litigation, and [plaintiff] was forced to seek a profits award in the context of a default judgment application. That the application for profits is made in the default judgment context, however, does not obviate the need for the Court to have some basis to make such an award.

7-Eleven, Inc., 2018 WL 1521859 at *4.

B. Statutory Damages Against Hendrix and Cottone

Plaintiffs seek $150,000 in statutory damages against Hendrix for his willful infringement of the copyrighted "Axis: Bold as Love" album artwork. See Hendrix Findings ¶¶ 81, 86. Plaintiffs submitted a copy of a receipt and box for a "Jimi Hendrix Hot Sauce Gift Pack," which was ordered by plaintiffs' counsel from "Pepper Palace" and shipped to her office. See Weber Decl. ¶¶ 15-16; Pepper Palace Box and Receipt, dated Jan. 26, 2017 (Docket # 443-3). Pepper Palace is a licensee of Hendrix. TAC ¶ 38(a). The packaging for the hot sauce included the "Axis: Bold as Love" signature without authorization, for which plaintiffs own a registered copyright. Hendrix Proposed Findings ¶ 72 (citing TAC ¶ 171). Plaintiffs also purchased two

different "V Syndicate Jimi Hendrix grinder cards" from a third-party licensee of PHP/RA. TAC

¶¶ 38(i), 56; Meyer Decl. ¶¶ 3-5. Each of these cards included the "Axis: Bold as Love"

signature without authorization, for which plaintiffs own a registered copyright. Hendrix

Proposed Findings ¶ 70 (citing TAC ¶ 56).

As for Cottone, plaintiffs seek $100,000 in statutory damages under the ACPA for each

of the three infringing domain names, for a total of $300,000. Non-Hendrix Proposed Findings

¶ 97.

1. <u>Legal Standards Applicable to Statutory Damage Awards</u>

Under the Copyright Act, an infringer is liable for (1) the copyright owner's actual

damages and any additional profits of the infringer or (2) statutory damages. 17 U.S.C. § 504(a);

<u>accord</u> <u>Brown v. Party Poopers, Inc.</u>, 2001 WL 1380536, at *4 (S.D.N.Y. July 9, 2001). Section

504(c) of the Copyright Act permits a court to award statutory damages "with respect to any one

work . . . in a sum of not less than $750 or more than $30,000 as the court considers just." <u>Id.</u>

§ 504(c)(1). If the court finds willful infringement, "the court in its discretion may increase the

award of statutory damages to a sum of not more than $150,000." <u>Id.</u> § 504(c)(2). Within these

statutory limits, the court has broad discretion in determining the appropriate statutory damages

award. <u>See</u> <u>Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.</u>, 807 F.2d 1110, 1116 (2d Cir.

1986); <u>accord</u> <u>Noble v. Crazetees.com</u>, 2015 WL 5697780, at *6 (S.D.N.Y. Sept. 28, 2015)

(citations omitted). "No proof of actual damages or, in fact, any damages, is necessary for the

award of statutory damages." <u>Hollander Glass Tex., Inc. v. Rosen-Paramount Glass Co., Inc.</u>,

291 F. Supp. 3d 554, 559 (S.D.N.Y. 2018) (citation omitted).

In calculating the statutory damages award, the Second Circuit has held that a court

should consider the following factors:

> (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.

Bryant v. Media Right Prods., Inc., 603 F.3d 135, 143-44 (2d Cir. 2010) (citation omitted);

accord Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 127 (2d Cir. 2014); Hollander Glass, 291 F. Supp. 3d at 559; Broad. Music, Inc. v. Prana Hosp., Inc., 158 F. Supp. 3d 184, 197 (S.D.N.Y. 2016).[5] "[W]illfullness in the context of statutory damages for copyright infringement means that the infringer either had actual knowledge that it was infringing the plaintiffs' copyrights or else acted in reckless disregard of the high probability that it was infringing plaintiffs' copyrights." Nat'l Football League v. PrimeTime 24 Joint Venture, 131 F. Supp. 2d 458, 475 (S.D.N.Y. 2001) (internal quotation marks and citation omitted; alteration in original) (citing cases). Where a defendant has defaulted, a complaint's allegations of willfulness may be taken as true. See Rovio Entm't, Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) (citing All-Star Mktg. Grp., LLC v. Media Brands Co., 775 F. Supp. 2d 613, 621-22 (S.D.N.Y. 2011)).

---

[5] Courts have also used a substantially similar set of factors as set forth in Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110 (2d Cir. 1986). These are:

> (1) "the expenses saved and the profits reaped;" (2) "the revenues lost by the plaintiff;" (3) "the value of the copyright;" (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;" and (7) "the potential for discouraging the defendant."

McGraw-Hill Glob. Educ. Holdings, LLC v. Khan, 323 F. Supp. 3d 488, 498 n.3 (S.D.N.Y. 2018) (discussing Fitzgerald Factors); see, e.g., Sream, Inc. v. W. Vill. Grocery Inc., 2018 WL 4735706, at *3 (S.D.N.Y. Oct. 1, 2018) (same); BWP Media USA, Inc. v. Gossip Cop Media, Inc., 196 F. Supp. 3d 395, 410 (S.D.N.Y. 2016) (same).

Similarly, under the ACPA, "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). "Courts in this jurisdiction have sought assistance when fashioning statutory damages awards from the case law construing" 17 U.S.C. § 504(c). Mamiya Am. Corp. v. HuaYi Bros., Inc., 2011 WL 1322383, at *7 (E.D.N.Y. Mar. 11, 2011), adopted by 2011 WL 1253748 (E.D.N.Y. Mar. 31, 2011).

2. Analysis of the Factors

We now discuss the factors in relation to the defaulting defendants' conduct in order to reach a statutory damages award. We begin by noting that Hendrix is liable to plaintiffs both as an alter ego of PHP/RA, TAC ¶¶ 213-221, as well as a principal of PHP/RA who had the ability to supervise the infringement, id. ¶¶ 179, 185. See generally Sygma Photo News. Inc. v. High Soc. Magazine, Inc., 778 F.2d 89, 92 (2d Cir. 1985) (all persons "who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers"); accord Broad. Music, Inc. v. The Living Room Steak House, Inc., 2016 WL 756567, at *4 (E.D.N.Y. Feb. 26, 2016).

With respect to the first factor, "by virtue of their default," Hendrix and Cottone "are deemed to be willful infringers." Lane Crawford LLC v. Kelex Trading (CA) Inc., 2013 WL 6481354, at *3 (S.D.N.Y. Dec. 3, 2013) (citing cases); accord Rovio Entm't, 97 F. Supp. 3d at 546 ("Copyright infringement is deemed willful by virtue of a defendant's default.") (citing All-Star Mktg., 775 F. Supp. 2d at 621-22); see also id. ("Trademark infringement is deemed willful by virtue of a defendant's default.") (citing Keystone Glob. LLC v. Auto Essentials, Inc., 2015

WL 224359, at *6 (S.D.N.Y. Jan. 16, 2015)).[6]  Moreover, Hendrix's willfulness is manifested by the fact that he has been involved in at least one other case in which the same infringing conduct was at issue.  See TAC ¶¶ 10-12 (2016 injunction issued against Hendrix for infringement by the United States District Court for the Southern District of Georgia); see also Cengage Learning, Inc. v. Shi, 2015 WL 5167775, at *5 (S.D.N.Y. Sept. 3, 2015) (willfulness found in part because "this [was] the second suit that the Plaintiffs . . . [had] brought against [defendant] for the same conduct").

As to factors two and three, we cannot determine from the record the full extent of the expenses saved or the profits earned by Hendrix or Cottone, and there is no information on the revenue lost by the plaintiffs.  With regard to Hendrix, plaintiffs bought several infringing products online to confirm that they were sold.  See Meyer Decl. ¶¶ 3-5 (infringing grinder cards); Weber Decl. ¶¶ 15-16 (infringing hot sauces).  With regard to Cottone, plaintiffs made a transaction at a website using one of the infringing domain names for the purchase of wine but were subsequently informed that the wine was not in fact available.  Meyer Decl. ¶¶ 6-9.  Notwithstanding the dearth of evidence on sales, this factor does not weigh against plaintiffs because, "defendants have declined to participate in this lawsuit, and have thus deprived plaintiffs of the opportunity to make a meaningful assessment of the extent of their business, including volume of sales and profits earned."  Polo Ralph Lauren, L.P. v. 3M Trading Co. Inc., 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999).

In any event, based on the test purchases or attempted purchases conducted by plaintiffs, we agree that defendants have likely sold more infringing products than is currently known.

---

[6] We sometimes cite to trademark cases inasmuch as courts undertake the same analysis of statutory damages under both trademark and copyright law.  See, e.g., Louis Vuitton Malletier v. Carducci Leather Fashions, Inc., 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009).

Further, "it is clear that the Defendants profited substantially from their infringing conduct, while the Plaintiffs suffered losses" in part because "Defendants bore none of the costs of creating any of the copyrighted works, yet profited from their unauthorized sale." <u>Shi</u>, 2015 WL 5167775 at *5; <u>see also id.</u> ("despite investing heavily in the creation of the copyrighted works, the Plaintiffs have seen no profits from the Defendants' sales").

The fourth factor — the deterrent effect on the infringer and third parties — also weighs in the plaintiffs' favor. "[C]ourts have repeatedly emphasized that defendants must not be able to sneer in the face of copyright owners and copyright laws." <u>Tu v. TAD Sys. Tech. Inc.</u>, 2009 WL 2905780, at *6 (E.D.N.Y. Sept. 10, 2009) (quoting <u>N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc.</u>, 1991 WL 113283, at *4 (S.D.N.Y. June 14, 1991) (internal quotation marks omitted)). In the case of "coordinated . . . and extensive copyright infringement," a substantial statutory damage award can "act as a specific deterrent to the [defendants] and a general deterrent to other like-minded infringers." <u>Cengage Learning v. Bhargava</u>, 2017 WL 9802833, at *5 (S.D.N.Y. Aug. 22, 2017), <u>adopted by</u> 2018 WL 1989574 (S.D.N.Y. Apr. 25, 2018); <u>see also</u> <u>Malletier v. Carducci Leather Fashions, Inc.</u>, 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009) ("where, as here, a defendant is shown to have acted willfully, a statutory award should incorporate not only a compensatory, but also a punitive component to discourage further wrongdoing by the defendants and others").

The last two factors weigh in plaintiffs' favor as well given that "defendants' default and subsequen[t] silence shows a lack of cooperation in determining damages." <u>Hollander Glass</u>, 291 F. Supp. 3d at 559. These factors weigh particularly in plaintiffs' favor given that Hendrix's behavior in this case led the Court to invoke terminating sanctions against him under Fed. R. Civ. P. 37(b)(2) for discovery abuses. <u>See</u> Hendrix Terminating Sanctions Order. Similarly,

Cottone, although he initially appeared by counsel, did not participate in discovery and refused to appear for a deposition, Weber Decl. ¶ 18, and GRCU's deposition witness impeded plaintiffs' attempts to quantify GRCU's profits given that the witness was "ill-prepared to answer any substantive questions regarding GRCU," id. ¶ 31.[7]

Plaintiffs seek the statutory maximum of $150,000 in copyright damages against Hendrix for his infringing use of the "Axis: Bold as Love" album artwork. Hendrix Proposed Findings ¶ 86. There is no doubt that Hendrix's flagrant disregard for judicial proceedings, see Hendrix Terminating Sanctions Order, and the fact that he has been haled into court repeatedly for violating plaintiffs' intellectual property rights, see TAC ¶¶ 10-12, justifies a significant award of statutory damages. In some circumstances, the lack of information about plaintiffs' actual damages, or Hendrix's actual profit from the infringement would counsel for an award well below the statutory maximum. See, e.g., All-Star Mktg., 775 F. Supp. 2d at 624-27 (awarding statutory damages of $25,000 to $50,000 per trademark, and $25,000 in copyright damages for infringement was appropriate where there was no information about defendants' earnings or plaintiff's losses). Here, however, Hendrix has previously been enjoined from "using any of Plaintiffs' copyrighted material" for "the sale, naming, identifying, offering for sale, marketing, labeling, packaging, promotion, distribution or advertising of any product or service." Experience Hendrix, L.L.C. et al v. Tiger Paw Distributors, LLC et al., No. 4:16 Civ. 00107 (S.D. Ga. Jan. 27, 2017) (Docket # 206) (permanent injunction). In light of the prior injunction, we find that an award at the high end of the statutory range is appropriate. See, e.g., Kepner-

---

[7] As already stated, the above factors, set forth in Bryant, are substantially similar to the set of factors articulated in Fitzgerald Pub. Co. We note that factor three from Fitzgerald, "the value of the copyright," Fitzgerald, 807 F.2d at 1117, which is not listed as a factor in Bryant, appears to weigh in the plaintiffs' favor, although plaintiffs do not supply any information on this topic to the Court.

Tregoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999) (affirming award of $100,000 in statutory copyright damages (the maximum at the time) where defendant "continued to use the [infringing] program even after a Texas district court and the Fifth Circuit found that the . . . program infringed [plaintiff's] copyrights and entered an injunction against [defendant's company's] use of the . . . program."); U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc., 2005 WL 1231645, at *6 (S.D.N.Y. May 25, 2005) (awarding maximum statutory copyright damages where, "[i]f there was any question as to the defendants' knowledge that their importation of films from Asia could violate U2's copyrights, that question was eliminated at the conclusion of the prior action" by the issuance of an injunction that was "flagrantly disregarded" by defendants), aff'd in part, vacated in part on other grounds, 245 F. App'x 28 (2d Cir. 2007); Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 522 (S.D.N.Y. 2004) (awarding maximum statutory damages where defendant "knew he was under an injunction not to sell counterfeit merchandise" but nonetheless did so). After considering the circumstances here, we conclude that plaintiffs should be given an award of $125,000 in statutory damages against Hendrix.[8]

---

[8] We do not recommend the maximum of $150,000 in part because we recognize that there is some potential that the infringing conduct that resulted in the trademark profits award, see section III.A.1 above, and the conduct making him liable for the copyright statutory infringement award overlapped in part. As case law notes, a "plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995); see also Cengage Learning, Inc. v. Globonline SDN, 2018 WL 1989574, at *2 (S.D.N.Y. Apr. 25, 2018) (collecting cases and noting that the "recent trend" in this Circuit is to "preclude double recovery" of statutory damages where damages under the Copyright Act and the Lanham Act are "coextensive"). Nonetheless, it is reasonably clear that the award of profits for trademark infringement encompassed conduct of far greater scope than the infringement based on the use of the "Axis: Bold as Love" artwork. See TAC ¶ 5 (Hendrix and others "renewed and expanded their infringement of Plaintiffs' trademarks and copyrights through the creation, development, licensing, manufacturing, promotion, advertsing [sic], and sale of Cannabis, edibles, food, wine,

Lastly, plaintiffs seek the maximum $100,000 statutory damages award against Cottone for each of the three domain names registered in violation of the ACPA.  Non-Hendrix Proposed Findings ¶ 108.  Thus, plaintiffs seek $300,000 in statutory damages.  Id.  We do not believe that the maximum award is appropriate here, however, for two reasons.  First, unlike the situation with Hendrix, there is no evidence that Cottone had previously been made aware of the illegality of his conduct.  Second, there is only "limited evidence of [the] actual harm [plaintiffs] [have] suffered" as a result of Cottone's registration of the three domain names.  Mamiya Am. Corp., 2011 WL 1322383, at *7.  In consideration of the "principle that statutory damages are a substitute for actual damages, and should replicate as nearly as possible the actual harm done to the successful plaintiff without punishing it for lacking information on the issue due to the absent defendant's default," id., the Court concludes $10,000 in statutory damages for each domain name is appropriate to meet the purposes of the statute, see, e.g., Next Realty, LLC v. Next Real Est. Partners LLC, 2019 WL 1757781, at *4 (E.D.N.Y. Mar. 11, 2019) ($10,000 for each of the seven domain names even where there was evidence offending behavior continued after notice of the lawsuit), adopted by 2019 WL 1758447 (E.D.N.Y. Mar. 26, 2019); Taikwok Yung v. Trump, 2014 WL 819417, at *6 (E.D.N.Y. Feb. 28, 2014) ($8,000 per domain name where there was no evidence of profit, and infringer was insolvent), adopted by 2014 WL 1257761 (E.D.N.Y. Mar. 26, 2014), aff'd, 648 F. App'x 24 (2d Cir. 2016); Taverna Opa Trademark Corp. v. Ismail, 2010 WL 1838384, at *3 (S.D. Fla. May 6, 2010) ($10,000 for single domain name).  Accordingly, plaintiffs should be awarded $30,000 in total statutory damages under the ACPA against Cottone.

---

'medicines,' electronic products, and other goods.").  Accordingly, we believe that the two awards do not run afoul of the rule against double recovery.

C.  Injunctive Relief

Plaintiffs seek injunctive relief against all of the defaulting defendants.  See Hendrix

Proposed Findings ¶¶ 96-105; Non-Hendrix Proposed Findings ¶¶ 109-117.  "A court may issue

an injunction on a motion for default judgment provided that the moving party shows that (1) it

is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the

issuance of an injunction."  Kingvision Pay-Per-View Ltd. v. Lalaleo, 429 F. Supp. 2d 506, 516

(E.D.N.Y. 2006) (internal quotation marks and citation omitted).  To obtain a permanent

injunction, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law,
> such as monetary damages, are inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the plaintiff and defendant, a
> remedy in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted); accord

Salinger v. Colting, 607 F.3d 68, 77-78 (2d Cir. 2010); Rovio Entm't, 97 F. Supp. 3d at 547.

> [T]he Copyright Act authorizes a court to "grant . . . final injunctions on such
> terms as it may deem reasonable to prevent or restrain infringement of a
> copyright." 17 U.S.C. § 502(a).  Similarly, the Lanham Act provides that federal
> courts "have power to grant injunctions, according to the principles of equity" in
> trademark infringement cases. 15 U.S.C. § 1116(a).

Shi, 2015 WL 5167775, at *6.  In this case, the eBay factors weigh in favor of granting an

injunction.  "In a trademark case, irreparable injury is established where there is any likelihood

that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed

simply confused, as to the source of the goods in question."  Lobo Enters., Inc. v. Tunnel, Inc.,

822 F.2d 331, 333 (2d Cir. 1987) (citation and internal quotation marks omitted); accord

Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) ("In

trademark disputes, a showing of likelihood of confusion establishes . . . irreparable harm.")

(citation and internal quotation marks omitted). And "courts routinely find the harm suffered by plaintiffs in copyright cases to be 'irreparable' on the theory that lost sales or diminished reputation can be difficult if not impossible to measure." Broad. Music, 158 F. Supp. 3d at 195. Accepting the allegations of the TAC as true, the plaintiffs have alleged a likelihood of confusion in the marketplace that could lead to diminished reputation and loss of sales.

The conduct alleged suggests that the defaulting defendants "might continue to engage in infringing activities and counterfeiting unless enjoined by the Court, demonstrating the danger that monetary damages will fail to fully provide [the plaintiff] with relief." Rovio Entm't, 97 F. Supp. 3d at 547; accord Broad. Music, 158 F. Supp. 3d at 195 ("Courts in this Circuit have consistently found monetary damages inadequate where the defendant poses a significant threat of future infringement.") (citing cases). Thus, the second factor weighs in plaintiffs' favor.

"As to the balance of hardships, '[i]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product.'" Rovio Entm't, 97 F. Supp. 3d at 547 (quoting WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 287 (2d Cir. 2012)) (alteration in original). Finally, "'the public has an interest in not being deceived — in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.'" Id. (quoting N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010)); accord Broad. Music, 158 F. Supp. 3d at 196 ("injunctive relief here will advance the public's compelling interest in protecting copyright owners' marketable rights to their work so as to encourage the production of creative work") (internal quotation marks, alterations, and citations omitted).

In sum, plaintiffs have established that they are entitled to injunctive relief, and an injunction against the defaulting defendants should be issued. Plaintiffs have proposed

injunctions as to each of the defaulting defendants.  See Order of Permanent Injunction, filed Feb. 3, 2020 (Docket # 441-1); Order of Permanent Injunction, filed Feb. 3, 2020 (Docket # 442-1); Order of Permanent Injunction, filed Feb. 3, 2020 (Docket # 442-2).  The Hendrix injunction mirrors the injunction previously entered by the Court against defendant Andrew Pitsicalis.  See Hendrix Findings ¶ 105 n.2; Order of Permanent Injunction, filed Oct. 21, 2019 (Docket # 365). The Cottone and GRCU injunctions are similar to the injunctions previously entered by the Court against other licensee defendants.  See Non-Hendrix Proposed Findings ¶ 117 n.3; Order of Permanent Injunction, filed Nov. 8, 2019 (Docket # 377); Order of Permanent Injunction, filed Nov. 25, 2019 (Docket # 394).  Therefore, the proposed injunctions enjoining the defaulting defendants' infringing conduct should be issued.

D.  Attorneys' Fees & Costs

Plaintiffs seek (1) $7,156.92 in attorneys' fees and $614.20 in costs against Cottone, Non-Hendrix Proposed Findings ¶ 125; (2) $13,900.25 in attorneys' fees and $2,491.60 in costs against GRCU, id.; and (3) $36,445.19 in attorneys' fees and $573.34 in costs against Hendrix, Hendrix Proposed Findings ¶ 113.  In aggregate, plaintiffs seek $57,502.36 in attorneys' fees and $3,679.14 in costs.

1.  Entitlement to Fees and Costs

The Lanham Act provides that a prevailing party shall be entitled to recover the "costs of the action" and in "exceptional cases" its "reasonable attorney fees."  15 U.S.C. § 1117(a).  At one time, Second Circuit case law held that deliberate and willful infringement, as occurred in this case, was sufficient to deem a case "exceptional" for the purposes of the trademark statute. See Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012) ("[T]he key [to attorneys' fees in a trademark action] is willfulness on the part of the defendants.").  Plaintiffs

cite this case law in support of their fee application.  See Hendrix Proposed Findings ¶¶ 107-108; Non-Hendrix Proposed Findings ¶¶ 118-120.  However, the Second Circuit subsequently abrogated the "willfulness" standard in light of the holding of the Supreme Court in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014).  See Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 531 (2d Cir. 2018) ("We now join [other federal circuits], concluding that under the Lanham Act, an exceptional case is one that stands out from others in the manner articulated by Octane Fitness . . . ."); 4 Pillar Dynasty LLC v. N.Y. & Co., Inc., 933 F.3d 202, 215 (2d Cir. 2019) (noting abrogation of "willfulness" standard in favor of Octane Fitness test).

    In Octane Fitness, the Supreme Court held that an exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  572 U.S. at 554.  Octane Fitness encouraged courts to look to case law arising under the Copyright Act, which considers the factors of "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  Id. at 554 n.6 (citation omitted).  In light of the similarity of the inquiries, a court may properly "cross-apply[] its Lanham Act analysis to [a party's] request for fees under the Copyright Act."  Louis Vuitton Malletier, S.A. v. My Other Bag, Inc., 764 F. App'x 39, 42 (2d Cir. 2019).

    We begin by noting that merely defaulting is insufficient to make a case exceptional.  As Judge Cott of this Court recently noted:

        In fact, defaulting defendants could not have litigated unreasonably because they
        did not litigate at all.  Although the Second Circuit has not directly addressed
        whether a default is considered "unreasonable" conduct under the Octane Fitness

standard, the Court shares the view of several district courts in other circuits that "[a] failure to respond does not make the case exceptional, otherwise every default case would warrant attorney's fees, which is not supported by the statute." Hunter Residential Servs., LLC v. AAA Randpro Plumbing, Inc., No. 8:16-CV-1311 (CEH) (TGW), 2017 WL 1987247, at *6 (M.D. Fla. Feb. 21, 2017). See also, e.g., Whirlpool Corp. v. Glob. Purification, LLC, No. 2:16-CV-463 (JRG), 2017 WL 2099771, at *4 (E.D. Tex. May 15, 2017); RCI TM Corp. v. R&R Venture Group, LLC, No. 6:13-CV-945, 2015 WL 668715, at *11 (M.D. Fla. Feb. 17, 2015). As one court put it succinctly: "Failing to answer a complaint does not constitute unreasonable litigation conduct; it is simply the absence of litigation conduct. Indeed, a default is a boon to the plaintiff, relieving it of the need to prove liability for the claims alleged in the complaint." Vivint, Inc. v. Christensen, No. 218-CV-313 (JNP)(PMW), 2019 WL 131857, at *3 (D. Utah Jan. 8, 2019). But see Crossfit, Inc. v. Quinnie, 232 F. Supp. 3d 1295, 1314 (N.D. Ga. 2017) (awarding attorneys' fees following default judgment where "the substantive strength of [plaintiff's] litigating position stands out from others"); CarMax Auto Superstores, Inc. v. StarMax Fin., Inc., 192 F. Supp. 3d 1279, 1284 (M.D. Fla. 2016) (awarding attorneys' fees where defendants defaulted but continued to infringe plaintiffs' trademark).

Travel Leaders Grp., LLC v. Corley, 2019 WL 6647319, at *14 (S.D.N.Y. Dec. 5, 2019).

The defaulting defendants here, however, do not fall into the category of defendants who merely failed to respond to the complaint. GRCU and Cottone originally appeared by counsel but then "failed to participate in discovery despite multiple court orders." Weber Decl. ¶ 31. At a deposition held pursuant to Fed. R. Civ. P. 30(b)(6), GRCU's witness was "ill-prepared to answer any substantive questions regarding GRCU, such as profits and losses, record keeping, and the like." Id. Cottone refused to appear for a deposition at all. Id. ¶ 18.

As was previously found by the district court, Hendrix engaged in "two years of stark, repeated failures . . . to engage in the discovery process, culminating in statements during a recent deposition in which he indicated that he continues to have no interest in or intention to comply with required pretrial discovery." Hendrix Terminating Sanctions Order at 1. The depositions of Hendrix had to be rescheduled twice because of his "failure to prepare or to produce the required documents," and "[a]t no point has Hendrix been in compliance with his

discovery obligations." Id. at 2-3. The district court found that the duration of Hendrix's noncompliance was "egregious and substantial." Id. at 3.

Given the defaulting defendants' behavior during litigation, including disobeying court orders and refusing to participate in discovery; the lack of a record of an objectively reasonable defense to the plaintiffs' claims of infringement; and the need to deter others from engaging in similar conduct, we conclude that this is an exceptional case and warrants an award of attorneys' fees. See John Wiley & Sons, Inc. v. Book Dog Books, LLC, 327 F. Supp. 3d 606, 643 (S.D.N.Y. 2018) (granting attorneys' fees in trademark and copyright action where defendants, inter alia, "violated the Court's Orders"); Univ. Instruments Corp. v. Micro Sys. Eng'g, Inc., 2018 WL 748871, at *2 (N.D.N.Y. Feb. 7, 2018) (granting fees where plaintiff "litigated this case in an unreasonable manner that exacerbated the issues to be resolved and the expenses incurred by all parties"); Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015) ("Courts in this District typically award Lanham Act fees based on extreme misconduct during litigation."); Sprint Commc'ns Co. L.P. v. Chong, 2014 WL 6611484, at *5 (S.D.N.Y. Nov. 21, 2014) (awarding fees where defendant "not only frustrated the litigation process by failing to participate, he obstructed the plaintiffs and caused unnecessary delay").

### 2. Calculation of Attorneys' Fees

As the Second Circuit noted in Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182 (2d Cir. 2008), "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. at 186 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

### a. Reasonable Hourly Rates

The rate to be set for plaintiffs' attorneys should be "what a reasonable, paying client would be willing to pay." Arbor Hill, 522 F.3d at 184. Any such rate must be "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Reiter v. MTA N.Y.C. Transit Auth., 457 F.3d 224, 232 (2d Cir. 2006) (alteration in original) (internal quotation marks omitted) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)). The attorneys seeking fees are Dorothy Weber, Judith Meyers, Joseph Conley, and Andrew Dunn. See Weber Decl. ¶¶ 36-45. Judge Engelmayer has already made an award of attorneys' fees to the attorneys in this matter for time spent and we follow his prior findings as to their reasonable rates. See Order, filed Sept. 19, 2018 (Docket # 213) ("First Fee Award") at 2 (approving $525 rate for Weber, $425 rate for Meyers, and $275 rate for Conley); Opinion & Order, filed Dec. 17, 2018 (Docket # 279) ("Second Fee Award") at 3 (approving rates of $525 for Weber, $425 for Meyers, $275 for Conley, and $200 for Dunn).

### b. Reasonable Number of Hours Expended

Plaintiffs must also establish that the number of hours for which they seek compensation is reasonable. Arbor Hill, 522 F.3d at 188. In evaluating whether claimed hours are reasonable, a court considers "not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992). "Because attorney's fees are dependent on the unique facts of each case, the resolution of this issue is committed to the discretion of the district court." Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992). In exercising this discretion, the district court should look "to its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." Id. (internal quotation marks omitted) (quoting Di Filippo v.

Morizio, 759 F.2d 231, 236 (2d Cir. 1985)).  Additionally, it is well-established that "any

attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the

application with contemporaneous time records . . . specify[ing], for each attorney, the date, the

hours expended, and the nature of the work done."  <u>N.Y. State Ass'n for Retarded Children, Inc.</u>

<u>v. Carey</u>, 711 F.2d 1136, 1148 (2d Cir. 1983).

In support of their application for attorneys' fees, plaintiffs' attorneys submitted copies of

their billing records showing the date on which services were performed, the hours expended,

and a description of the work done.  <u>See</u> Leon Hendrix Invoice, filed Feb. 3, 2020 (Docket

# 443-15) ("Hendrix Hours"); Cottone Invoice, filed Feb. 3, 2020 (Docket # 443-17) ("Cottone

Hours"); GRCU Invoice, filed Feb. 3, 2020 (Docket # 447-19) ("GRCU Hours").  Plaintiffs state

that these documents are summaries of time records that were prepared contemporaneously.

Weber Decl. ¶ 47.  Thus, plaintiffs' invoices satisfy the contemporaneous time records

requirement.  <u>See</u>, <u>e.g.</u>, <u>Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148,

1160–61 (2d Cir. 1994); <u>Hollander Glass</u>, 291 F. Supp. 3d at 562–63.

When reviewing such records, a court's task is to make "a conscientious and detailed

inquiry into the validity of the representations that a certain number of hours were usefully and

reasonably expended."  <u>Lunday v. City of Albany</u>, 42 F.3d 131, 134 (2d Cir. 1994).  "The critical

inquiry is 'whether, at the time the work was performed, a reasonable attorney would have

engaged in similar time expenditures.'"  <u>Angamarca v. Pita Grill 7 Inc.</u>, 2012 WL 3578781, at

*12 (S.D.N.Y. Aug. 2, 2012) (quoting <u>Grant v. Martinez</u>, 973 F.2d 96, 99 (2d Cir. 1992)).  In

addressing this question, courts should not, however, engage in "an <u>ex</u> <u>post</u> <u>facto</u> determination

of whether attorney hours were necessary to the relief obtained."  <u>Grant</u>, 973 F.2d at 99.

Additionally, if a court finds that claimed hours are "excessive, redundant, or otherwise

unnecessary," it should exclude those hours from its calculation of the presumptively reasonable fee. Hensley, 461 U.S. at 434; accord Quaratino v. Tiffany & Co., 166 F.3d 422, 426 n.6 (2d Cir. 1999) (citations omitted); Farmer v. Hyde Your Eyes Optical, Inc., 2015 WL 2250592, at *15 (S.D.N.Y. May 13, 2015). However, as the Supreme Court noted in Hensley, "[t]here is no precise rule or formula for making these determinations." 461 U.S. at 436. Thus, a district court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items." Lunday, 42 F.3d at 134.

Here, attorneys expended a total of 91.02 hours on work for which they are seeking attorneys' fees against Hendrix, Weber Decl. ¶ 49; 18.22 hours of work for which they are seeking attorneys' fees against Cottone, id. ¶ 51; and 40.75 hours of work for which they are seeking attorneys' fees against GRCU, id. ¶ 53. These hours reflect time spent drafting complaints, time spent conducting discovery, motion practice, and court appearances. Id. ¶ 46.[9] Plaintiffs are not seeking full recovery of each billable hour as to each defaulting defendant. Rather, the time entries have been pro-rated based on either the number of defendants named in the complaint at the time of the entry or the number of defendants for which the specific entry applies. Id. ¶ 48. Thus, for the March 3, 2017, task "Revise Complaint," plaintiffs seek one-sixth of attorneys' fees as against Cottone, given that Cottone was one of six defendants named in the initial complaint. Id. For the October 25, 2019, task of "Conducting Leon Hendrix deposition," by contrast, the full cost associated with that entry has been applied to plaintiffs' request for attorneys' fees against Hendrix, given that the entry applies only to him. Id. We

_____

[9] We note that the request for hours here does not overlap with the hours that were requested in prior fee awards. See Attorneys Fees, filed Sept. 13, 2018 (Docket # 205-1); Shukat Arrow Time Entries, filed Dec. 5, 2018 (Docket # 274-1).

accept this methodology and Judge Engelmayer has previously noted that other billing records submitted by plaintiffs were "admirably detailed and appear not to reflect any duplicative effort." First Fee Award at 2; <u>accord</u> Second Fee Award at 3 (finding billing records "persuasive, detailed, and complete."). The records also demonstrate an effort to avoid duplication of efforts. As an example, plaintiffs only request fees for the presence of a single attorney at Hendrix's deposition, even though three attorneys were present. <u>See</u> Hendrix Hours at 4. Finally, we find that the total number of hours are appropriate in light of the extensive litigation that was required to obtain the default judgments.

### 3. Costs

Plaintiffs provide documentation to support their request for $3,679.14 in costs. <u>See</u> Leon Hendrix Costs, filed Feb. 3, 2020 (Docket # 443-16) ("Hendrix Costs"); Cottone Costs, filed Feb. 3, 2020 (Docket # 443-18) ("Cottone Costs"); GRCU Costs, filed Feb. 3, 2020 (Docket # 443-20) ("GRCU Costs"). These documents reflect expenses consisting of $2,491.60 in transcription and other fees related to the deposition of GRCU's 30(b)(6) witness, $573.34 in fees related to the second deposition of Hendrix, and $614.20 in fees for service of process on Cottone. <u>See</u> Weber Decl. ¶¶ 50, 52, 54; Hendrix Costs; Cottone Costs; GRCU Costs. "These are the types of routine costs awarded to prevailing parties in trademark and copyright infringement actions." <u>GAKM Res. LLC v. Jaylyn Sales Inc.</u>, 2009 WL 2150891, at *10 (S.D.N.Y. July 20, 2009) (awarding costs for court reporters, transcripts, and service fees); <u>accord</u> <u>M. Lady, LLC v. AJI, Inc.</u>, 2009 WL 1150279, at *10 (S.D.N.Y. Apr. 29, 2009). Accordingly, plaintiffs should be awarded a total of $3,679.14 in costs.

E.  Summary of Amounts Awarded

| Defendant | Trademark Damages | Copyright Damages | Attorneys' Fees | Costs | Total |
|---|---|---|---|---|---|
| Hendrix | $240,000.00 | $125,000.00 | $36,445.19 | $573.34 | $402,018.53 |
| Cottone | $30,000.00 | $0.00 | $7,156.92 | $614.20 | $37,771.12 |
| GRCU | $0.00 | $0.00 | $13,900.25 | $2,491.60 | $16,391.85 |
| Total | | | | | $456,181.50 |

## IV.  CONCLUSION

For the foregoing reasons, plaintiffs' motion for default judgment should be granted to the extent stated above.  Plaintiffs should be awarded judgments of $402,018.53 against Leon Hendrix; $16,391.85 against Green Cures & Botanical Distribution, Inc.; and $37,771.12 against Carmen Cottone.  Plaintiffs' request for injunctive relief against each of the defaulting defendants should be granted, and permanent injunctions in the same form as proposed by plaintiffs (Docket ## 441-1, 442-1, and 442-2) should be entered.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  A party may respond to any objections within 14 days after being served.  Any objections and responses shall be filed with the Clerk of the Court.  Any request for an extension of time to file objections or responses must be directed to Judge Engelmayer.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

While not legally required, the plaintiffs are directed to mail copies of this Report and Recommendation to the defaulting defendants at their last known addresses and to file proof of service thereof within 7 days. If they are unable to do so, they shall inform the Court by letter filed on ECF by the same date.

Dated: July 1, 2020
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge